HAYDEN B. RENWICK v. THE NEWS AND OBSERVER PUBLISHING COM-
PANY, D/B/A THE RALEIGH TIMES

HAYDEN B. RENWICK v. GREENSBORO NEWS COMPANY, D/B/A THE
GREENSBORO DAILY NEWS AND RECORD

No. 8215SC432

(Filed 5 July 1983)

1. **Libel and Slander § 14.1— newspaper editorials—potentially defamatory—dis-
missal improper**

Where ordinary men could naturally understand an editorial printed in
defendants' newspapers to imply or insinuate that plaintiff's statistics regard-
ing the number of blacks denied admission to UNC between 1975 and 1979
were either knowingly and intentionally false, or the result of gross in-
competence in the conduct of plaintiff's profession, the trial court erred in
dismissing plaintiff's action since the editorial as a whole is reasonably suscep-
tible of a defamatory meaning so as to warrant its submission to a jury to
determine if, in fact, the defamatory meaning was so understood.

2. **Libel and Slander § 5.2— defamatory statements as actionable—literal asser-
tions**

Where an editorial made it unlikely that the ordinary reader would not
conclude that plaintiff had dishonestly or recklessly released false figures
about blacks denied admission to UNC because he was dissatisfied with the ex-
isting minority admissions policies and practices, and where other portions of
the editorial referred obliquely to adverse consequences the "irresponsible"
charges had had, a defamatory imputation of personal dishonesty and irrespon-
sibility on the part of an employee in a position of authority at a public univer-
sity, while not expressly stated, was nonetheless strongly implied. The
charges, whether express or implied, went far beyond the mere expression of
editorial disagreement with those who charged the university with racial dis-
crimination as defendant contended. The editorial's contents gave no indication
that the charges were meant, or would be interpreted, in any but their literal
sense. As literal assertions, the implied charges, as well as those stated ex-
plicitly in the editorial, more nearly resembled the statements found sufficient-
ly factual in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) to support a libel
action, than they did the obviously personal evaluations expressed through
slogans insufficiently specific to be proved false in *Greenbelt Pub. Ass'n v.
Bresler*, 398 U.S. 6 (1970) and *Letter Carriers v. Austin*, 418 U.S. 264 (1974).

3. **Libel and Slander § 5.2— defamation claim sufficient to withstand motion to
dismiss**

Notwithstanding any possible ambiguity with respect to whether an
editorial stated facts or stated opinions, the Court's examination of the con-
stitutional and legal principles developed in the line of cases beginning with
*New York Times Co. v. Sullivan* leads to the conclusion that even if the

editorial were to read as only expressing the "opinion" that plaintiff dishonestly and irresponsibly charged the University with denying admission to 800 black students when, as a "fact," only 36 blacks had been denied access, it is not absolutely protected under *Gertz*. Rather, the editorial is protected, if at all, only by the qualified protection afforded by *Sullivan* for a comment based upon erroneous facts where proof is lacking that the defendants actually knew of the falsity or acted in reckless disregard to the truth or falsity of the assertions. *A fortiori* a claim based upon an ambiguous editorial would be sufficient to withstand a motion to dismiss.

4. **Libel and Slander § 5.2 — defamation action — underlying facts to support "opinion" stated in editorial — not insulating defendants from liability**

The fact that defendants disclosed the underlying facts supporting their opinion in an editorial, standing alone, did not insulate the editorial under First Amendment protections for the following reasons: (1) the key underlying fact regarding plaintiff's allegation, which formed the subject of the editorial, is alleged to be false in the complaint, and (2) the structure of the editorial is such that the disclosed facts do not function to indicate that a particular word constitutes a loose, protected opinion rather than a direct charge; rather, it is the detailing of the facts themselves that could be read as charging plaintiff with dishonesty.

5. **Libel and Slander § 14.3 — privilege of fair comment**

The privilege of fair comment is a matter of defense to an action for defamation. Dismissal of the complaint on the grounds that the statements are privileged comment is seldom appropriate because the privilege is only a qualified one, defeasible upon a showing that the comments were written with actual malice.

6. **Privacy § 1 — false light invasion of privacy — sufficiency of complaint**

For the same reasons that editorial opinions may predicate a libel action because they are (1) not absolutely protected as "pure opinion" under the First Amendment, (2) are based upon an allegedly false statement of fact and (3) are inextricably intertwined with the allegedly false factual disclosure, thus capable of giving them the effect of false statements of fact upon the reader, they may also predicate a false light invasion of privacy action.

7. **Libel and Slander § 6 — republication of defamation**

Pleadings in a defamation action sufficiently alleged republication with knowledge of material inaccuracies or in reckless disregard of whether such statements were inaccurate to withstand defendants' motion to dismiss the complaint.

Judge WELLS dissenting.

APPEAL by plaintiff from *Martin, Judge.* Judgments entered 3 March 1982 in Superior Court, ORANGE County. Heard in the Court of Appeals 9 March 1983.

Plaintiff, Hayden B. Renwick, Dean of the College of Arts and Sciences at the University of North Carolina at Chapel Hill, filed duplicate actions alleging libel and invasion of privacy against media defendants, The News and Observer Publishing Company and Greensboro News Company. The twin suits are founded upon an editorial originally published in *The Raleigh Times* on 22 April 1981, entitled, "And He Calls It Bias?", and reprinted by the Greensboro News Company on 26 April 1981 in the *Greensboro Daily News and Record* in a commentary section, "Around the State," under the title, "Discrimination?" *The Raleigh Times* editorial reported and commented upon the public controversy surrounding the University of North Carolina's minority admissions efforts and the plaintiff's role in this controversy. Plaintiff's request for a retraction on the grounds that the editorial defamed him was denied by both newspapers. The defendants in both actions filed motions to dismiss the complaints, and a consolidated hearing was held. From judgments entered dismissing the actions pursuant to G.S. 1A-1, Rule 12(b)(6) for failure to state a claim, plaintiff appeals.

*Kennedy, Kennedy, Kennedy and Kennedy, by Annie Brown Kennedy, Harvey L. Kennedy and Harold L. Kennedy, III, for plaintiff appellant.*

*Sanford, Adams, McCullough & Beard, by H. Hugh Stevens and Nancy Bentson Essex, for defendant appellee, The News and Observer Publishing Company.*

*Smith, Moore, Smith, Schell & Hunter, by Richard W. Ellis and Alan W. Duncan, for defendant appellee, Greensboro News Company.*

JOHNSON, Judge.

The two cases in this libel and invasion of privacy action have been consolidated for purposes of appeal. The common questions presented for review are whether plaintiff's complaint (1) states a claim for relief for defamation and (2) states a claim for relief for invasion of privacy. Defendant Greensboro News raises an additional issue in its brief concerning a newspaper's liability for republication of the allegedly defamatory writings of another newspaper. For the reasons set forth below, we reverse the judgment dismissing plaintiff's complaints.

A copy of the editorial as it appeared in each defendant's newspaper is incorporated by reference into each complaint. The two complaints present substantially identical allegations and, where appropriate, they will be treated as a single complaint. The record on appeal contains no indication that pleadings responsive to the complaints were filed, and consists solely of the two complaints and two motions to dismiss, phrased exclusively in the language of Rule 12(b)(6) of the Rules of Civil Procedure.[1] The judgment dismissing the complaint fails to state the grounds upon which dismissal was considered appropriate.

A complaint is deemed sufficient to withstand a motion to dismiss under Rule 12(b)(6) where no insurmountable bar to recovery appears on the face of the complaint and the complaint's allegations give adequate notice of the nature and extent of the claim. *Presnell v. Pell,* 298 N.C. 715, 260 S.E. 2d 611 (1979); *Sutton v. Duke,* 277 N.C. 94, 176 S.E. 2d 161 (1970). A claim for relief should not suffer dismissal unless it affirmatively appears that plaintiff is entitled to no relief under any state of facts which could be presented in support of the claim. *Presnell v. Pell, supra; Newton v. Insurance Co.,* 291 N.C. 105, 229 S.E. 2d 297 (1976). The function of a motion to dismiss is to test the law of a claim, not the facts which support it. *Snyder v. Freeman,* 300 N.C. 204, 266 S.E. 2d 593 (1980). The allegations of the complaint are taken as true for the limited purpose of testing its sufficiency. *Presnell v. Pell, supra.* With these rules in mind, we must determine if the facts pleaded, together with reasonable inferences to be drawn therefrom, involve substantive principles of law which entitle plaintiff to relief.

---

1. It was brought to this Court's attention both during oral argument and by the briefs submitted by the defendants, that Dean Renwick's deposition was taken in the case and filed with the trial court, together with motions for summary judgment, prior to the hearing on the Rule 12(b)(6) motions. Further, that matters addressed in the deposition which were material and germane to the allegations of the complaint and to the defense were brought to the attention of the court during the hearing. The Renwick deposition is not part of the record on appeal and this Court has not been provided a transcript of the hearing. Thus, we are not in a position to know if matters outside the pleading were, in fact, presented to and not excluded by the court. When this does occur, Rule 12(b) provides that the motion to dismiss shall then be treated as one for summary judgment and disposed of as provided in Rule 56. Information contained in the Renwick deposition is not properly before this Court, despite the efforts of both defendants to present it in their briefs, and, therefore, we will consider neither that information nor those arguments of the defendants which are based upon the deposition information.

The plaintiff in this action was, at the time of the publications, and is presently, the Associate Dean of the College of Arts and Sciences at the University of North Carolina at Chapel Hill. He had been an employee of the University of North Carolina (UNC) since 1969. Sometime prior to 1978, plaintiff Renwick was in charge of the University's minority admissions program at the Chapel Hill campus. *The Raleigh Times* editorial discusses and comments upon an issue of great public interest involving UNC's minority admissions policies, charges from Washington of racial discrimination against minority applicants, and plaintiff's role in the controversy surrounding the adequacy of the University's minority admissions efforts.

As a preliminary matter, we note that in order to recover for defamation it is plaintiff's burden to allege and prove that defendants made false and defamatory statements of or concerning plaintiff, which were published to a third person causing injury to plaintiff's reputation and, if the plaintiff is a public official or public figure, plaintiff must allege and prove actual malice on the part of defendants. *See generally Hall v. Publishing Co.,* 46 N.C. App. 760, 266 S.E. 2d 397 (1980) and Restatement (Second) of Torts §§ 558, 580A (1977). With regard to fault, the complaint alleges that the statements at issue were published negligently, with knowledge of their falsity or with reckless disregard for the truth, and with actual malice. Plaintiff seeks both actual and punitive damages and the complaint further alleges that the statements were willful and wanton, published in bad faith, maliciously, and in total disregard of the truth. Similar allegations of reckless disregard for the truth, malice, and bad faith accompany the claim for invasion of privacy.

Plaintiff neither contests nor expressly concedes that he is a "public figure" for purposes of the constitutional limitation on state libel actions established in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 2d 686 (1964) and its progeny. Inasmuch as the pleading adequately alleges the standard of liability appropriate for a publisher of defamatory falsehood injurious to a public official or figure, we will treat the plaintiff as a public figure for purposes of this appellate review. We note only that Dean Renwick appears to fit under either of the two characterizations of a "public figure" stated in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed. 2d 789, 808

Renwick v. News and Observer and Renwick v. Greensboro News

(1974).[2] *See also Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed. 2d 1094 (1967) and *Hall v. Publishing Co., supra.*

The editorial appeared in *The Raleigh Times* on 22 April 1981 as follows:[3]

## And He Calls It Bias?

Some of the continuing deluge of charges from Washington against the University of North Carolina at Chapel Hill —many obviously unfounded—are so ridiculous they only widen the gulf between reason and resentment as the State seeks to create better racial relations.

*The latest barrage is based on allegations by Hayden Renwick, Associate Dean of the College of Arts and Sciences at Chapel Hill, in a 1978 newspaper article. Renwick, formerly in charge of minority admissions, said that between 1975 and 1978 about 800 black students had been denied admission.*

Yet Collin Rustin, the Minority Admissions Director since 1975, flatly denies the charge. Furthermore, the special admission concessions in effect for blacks also give the lie to charges of unfair discrimination against minorities.

According to Rustin, every black student who meets the minimum standard combined score of 800 on the Scholastic Aptitude Test and has a 1.6 predicted grade point average is AUTOMATICALLY admitted. The exception would be if the applicant had not taken high school subjects required for admission.

That's discrimination? When the 800 required is only half the maximum possible score of 1,600? When the average SAT score for other competitive students admitted to last fall's

2. "For the most part those who attain this [public figure] status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust *themselves* to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

3. We have italicized those portions of the editorial which plaintiff principally claims contain false and defamatory statements concerning him.

freshman class at Carolina was between 1,070 and 1,080? When those competitive students admitted were in the top five percent of their high school graduating classes? When only 4,800 of 11,500 applicants clamoring to get in were admitted?

It has taken North Carolinians years to adjust to the necessity to grant some minority applicants, because of their disenfranchised background, special concessions in admissions. This gives them a chance to prove that their academic deficiencies are only temporary, not permanent.

*But extremists who belittle and criticize these concessions* — which indeed, seem here so excessive they do nothing for the student or the quality of education — *should be publicly rebuffed.*

The fact that, according to a 1979 faculty committee report, only 36 blacks have been denied access to UNC between 1975 and 1979 — compared to 6,700 competitive students turned away in one season — attests to UNC's yeoman efforts to make minorities welcome on campus. *How long highly qualified whites denied admissions will tolerate this reverse discrimination without taking the University to court is undoubtedly affected by irresponsible charges such as this one.*

With regard to defamation, plaintiff's first cause of action alleges *inter alia*:

That in said Article (Exhibit A) plaintiff is reported as having said in a 1978 newspaper article "that between 1975 and 1978 about 800 black students had been denied admission."[4] That said statement is false. That the entire Article (Exhibit A) gives the impression that the plaintiff is an extremist, a liar and is irresponsible in his profession. That said article has exposed plaintiff to public hatred, contempt and ridicule causing him embarrassment and humiliation.

\* \* \*

---

4. The quotation marks were inexplicably missing from the complaint against The News and Observer, while included in the complaint against The Greensboro News. We choose to include them here as they render the awkward phrasing of the allegation somewhat clearer.

That the publication of false and libelous statements set forth in Paragraph V herein, constitutes libel per se. In the alternative, such statements have a special meaning or innuendo in that they held the plaintiff out to the public to be an extremist, liar and irresponsible in his profession, and thereby constitute libel per se.

The second cause of action for invasion of privacy alleges:

That the publication of the foregoing statements set forth in Paragraph IV herein, placed the plaintiff in a false light before the public and constituted an invasion of plaintiff's privacy. That said statements were published with knowledge of their falsity or with reckless disregard for their truth.

That by reason of the defendant placing the plaintiff in a false light and thereby invading his privacy, the plaintiff has been injured in his good name, and in his profession, and brought into public disgrace, contempt and infamy in his community . . .

On appeal, plaintiff contends that the complaint states a claim for libel *per se* under the theory that the words concerning plaintiff were in themselves libelous, or that the editorial read as a whole libelously imputes dishonesty and irresponsibility to the plaintiff. Further, that the editorial holds plaintiff out to public contempt and tends to impeach him in his profession. In an attempt to establish the defamatory nature of the editorial, plaintiff devotes the greater portion of his brief to an analysis of the law of libel as existed in North Carolina prior to the United States Supreme Court's imposition of significant constitutional limitation on libel and invasion of privacy actions in *New York Times Co. v. Sullivan, supra,* and *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed. 2d 456 (1967).

In sharp contrast to plaintiff's approach to the issue, defendants rely almost exclusively on legal and constitutional principles generated by *New York Times Co. v. Sullivan* and its progeny. As their primary argument, defendants point out that a plaintiff within the ambit of *Sullivan* has, at least as a practical matter, the burden of proving falsity, since he must in any event establish that defendants published with knowledge of falsity or reckless

disregard of the truth.[5] Further, that because statements of opinion cannot be proved false, they cannot be held libelous no matter how unreasonable or vituperous the opinion may be. Both defendants argue that the editorial represents nothing more than a forcefully expressed opinion on a public issue of considerable statewide importance; as such, its publishers are to be afforded absolute immunity from liability for injury to plaintiff's reputation under the constitutional privilege for expressions of opinion enunciated in *Gertz v. Robert Welch, Inc., supra.*

Defendant Greensboro News presents an additional argument in support of the dismissal based upon the common law privilege of fair comment, which also recognized the key distinction between statements of fact and opinion in libel actions. The Greensboro News contends that the statements are not actionable because the underlying facts are set out in the editorial, that those facts are not materially false and could in no way constitute libel against the plaintiff. On this basis, it is argued that the editorial constitutes fair comment upon a matter of public concern and may not be made the subject of a claim for libel. Defendant Raleigh Times takes the position that the common law *qualified* privilege of fair comment has been wholly superceded by the *Gertz* rule of *absolute* protection.

The arguments presented by the defendants with respect to plaintiff's claims for invasion of privacy essentially mirror those made with respect to the libel claims regarding the necessity that plaintiff prove the statements made concerning him were substantially false. Thus, we are presented with a number of issues arising under the common law of libel and invasion of privacy, the constitutional guarantees of freedom of speech and press, and the interplay between them. We turn first to the questions of whether the editorial is capable of bearing the meaning urged by plaintiff, and whether that meaning is defamatory.

---

5. *See, e.g. Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed. 2d 115 (1979); *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed. 2d 328 (1975).

## I

## Libel Per Se

In general, the tort of defamation is an invasion of the interest in reputation and good name. Three classes of libel are recognized in North Carolina. They are: (1) publications obviously defamatory which are called *per se;* (2) publications susceptible of two interpretations, one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquim, and explanatory circumstances become libelous, which are termed libels *per quod. Arnold v. Sharpe,* 296 N.C. 533. 251 S.E. 2d 452 (1979). We are not concerned here with libels of either the second or third class since the language published was clear and unambiguous and plaintiff has failed to plead extrinsic facts and circumstances which would render otherwise innocuous statements libelous.

A most thorough definition of libel *per se* was stated by our Supreme Court in *Flake v. News Co.,* 212 N.C. 780, 785-87, 195 S.E. 55, 59-60 (1938).

> A libel *per se* is a malicious publication expressed in writing, printing, pictures, caricatures, signs, or other devices which upon its face and without aid of extrinsic proof is injurious and defamatory . . .

> In its most general and comprehensive sense it may be said that any publication that is injurious to the reputation of another is a libel . . .

> . . .

> In order to be libelous *per se* it is not essential that the words should involve an imputation of crime, or otherwise impute the violation of some law, or moral turpitude, or immoral conduct . . . But defamatory words to be libelous *per se* must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided. The imputation must be one tending to affect a party in a society whose standard of opinion the court can recognize . . .

. . .

> The general rule is that publications are to be taken in the sense which is most obvious and natural and according to the ideas that they are calculated to convey to those who see them. The principle of common sense requires that courts shall understand them as other people would. The question always is how would ordinary men naturally understand the publication. (Citations omitted.)

The Court in *Flake* then summarized the case law as follows:

> The decisions in this jurisdiction, as well as others, clearly establish that a publication is libelous *per se*, or actionable *per se*, if, when considered alone without innuendo: (1) It charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to ridicule, contempt, or disgrace, or (4) it tends to impeach one in his trade or profession. (Citations omitted.)

*See also Arnold v. Sharpe, supra; Badame v. Lampke,* 242 N.C. 755, 89 S.E. 2d 466 (1955); *Kindley v. Privette,* 241 N.C. 140, 84 S.E. 2d 660 (1954).

Plaintiff argues that the editorial implies that he is a liar, an extremist, ridiculous, irresponsible, and one who should be publicly rebuffed, that these are false factual charges, and that they tended to subject plaintiff to ridicule, public hatred, contempt or disgrace and tended to injure the plaintiff in his profession.

As a preliminary matter, we note that in determining the actionability of a written imputation, the entire statement is to be considered. The writing should be interpreted from its four corners and the intent and meaning of an alleged defamatory statement must be gathered not only from words singled out as libelous, but from the context in which they appear. All the parts of the publication must be considered in order to ascertain the true meaning, and words are not to be given a meaning other than that which the context would show them to have. 50 Am. Jur. 2d, Libel and Slander, § 141, p. 643 (1970); Restatement (Second) of Torts § 563, Comment d. The initial question for the court is whether the editorial is reasonably susceptible of a defamatory connotation, so as to warrant its submission to a jury to deter-

mine if in fact the defamatory connotation was conveyed. Restatement, *supra*, § 614. When read as a whole, we find the editorial capable of bearing a meaning that is defamatory in either of the senses urged by plaintiff.

The editorial as it appeared in *The Raleigh Times* bore the title, "And He Calls It Bias?" The opening paragraph comments upon the deleterious effect many of the "obviously unfounded" and "ridiculous" charges from Washington against UNC has upon the citizens of the state. The second paragraph attributes the "latest barrage" of these charges to "allegations by Hayden Renwick, Associate Dean of the College of Arts and Sciences at Chapel Hill, in a 1978 newspaper article." The sole reference to the content of that 1978 article is as follows: "Renwick, formerly in charge of minority admissions, said that between 1975 and 1978 about 800 black students had been denied admission." Paragraphs 3, 4, 5 and 8 are devoted to a refutation of Renwick's purported allegation concerning UNC's minority admissions practices. Paragraph 3 states that the Minority Admissions Director during the years in question "flatly denies the charge." Paragraph 8 states *as a fact* that only 36 blacks have been denied access to UNC between 1975 and 1979, according to a 1979 faculty committee report. In paragraph 3 it is pointed out that in themselves, "the special admission concessions in effect for blacks also give the lie to charges of unfair discrimination against minorities." Paragraph 8 concludes by stating that "irresponsible charges such as this one" undoubtedly affect the length of time highly qualified whites denied admissions will tolerate the "reverse discrimination" practiced by UNC. In paragraph 6 the editorial calls for the public rebuff of those "extremists" who belittle and criticize UNC's seemingly excessive special admissions concessions for blacks.

[1] Injury to reputation through defamation may be accomplished by both direct and indirect imputations and insinuations. W. Prosser, The Law of Torts, § 111, p. 746 (4th Ed. 1971). It is not necessary that the charge be made in a direct, positive and open manner. A mere inference, implication, or insinuation is as actionable as a positive assertion if the meaning is plain. 50 Am. Jur. 2d, Libel and Slander, § 13, p. 528. We conclude that ordinary men would naturally understand the editorial to imply or insinuate that plaintiff's statistics regarding the number of blacks denied admission to UNC between 1975 and 1979 were either

knowingly and intentionally false, or the result of gross incompetence in the conduct of plaintiff's profession. Either implication would appear to be dictated by the unexplained disparity between the 800 figure attributed to plaintiff, and the figure of 36 stated in "a 1979 faculty committee report." In addition, plaintiff's purported charges are termed "irresponsible," that is, made without consideration of possible consequences and held up to be a likely impetus or precipitating factor to future lawsuits against plaintiff's employer, UNC. These charges, if made in a positive and open manner, would be actionable.

Communications which have been held actionable *per se* include: accusations that plaintiff, a school cafeteria manager, brought "liquor" onto the school premises and distributed it to painters then employed in the school cafeteria. *Presnell v. Pell, supra;* the statement, "Do you know Captain McCall of the Charlotte Police Department? Call him and he can tell you about all the shady deals Mr. Badame has pulled." *Badame v. Lampke, supra;* allegations that a minister who was a member of a church "had been a disorderly member thereof in the sense that he was unwilling to cooperate in maintaining peace and the right spirit in church but caused trouble amounting to a continuous upheaval, and disrupted the peace and harmony of the church and therefore was excluded therefrom." *Kindley v. Privette, supra;* the statement by a butcher that his competitor had slaughtered a mad dog-bitten cow, *Broadway v. Cope,* 208 N.C. 85, 179 S.E. 452 (1935); a publication which said of an ordained minister that there was not in this generation "a more ignorant man . . . or one less charitable toward men who might honestly disagree with him." *Pentuff v. Park,* 194 N.C. 146, 138 S.E. 616 (1927); and statements in a letter from a CPA to the Internal Revenue Service which complained about plaintiff IRS agent's "harrassment [sic] of the client whose tax return was under review," her "inability to grasp certain fundamental accounting practices," a level of "expertise below what one should expect of an Internal Revenue Agent," and plaintiff's general lack of professionalism as compared with other IRS agents. *Angel v. Ward,* 43 N.C. App. 288, 258 S.E. 2d 788 (1979).

Words which have been held not to be actionable *per se* are: the plaintiff had "infavorable [sic] personal habits," *Robinson v. Nationwide Insurance Co.,* 273 N.C. 391, 159 S.E. 2d 896 (1968);

that the plaintiff, who was white, "had negro blood in his veins," *Deese v. Collins*, 191 N.C. 749, 133 S.E. 92 (1926). From a reading of these cases, we believe the editorial, insofar as it imputes dishonesty and/or incompetence and irresponsibility to plaintiff, would tend to expose plaintiff to ridicule, public hatred or contempt and tend to deprecate plaintiff in his profession. If proven to be false, these imputations would constitute libel *per se.*

However, we do not agree with plaintiff that the term "extremist" as used in this editorial would constitute libel *per se.* We acknowledge that in some circles the word may not be considered complementary. However, as used here, the term carried no pejorative connotation that could adversely affect plaintiff's professional character or subject him to public contempt and ridicule. In context, the epithet merely expressed the newspaper's view that plaintiff was indirectly advocating that UNC make even greater efforts in the area of minority admissions.

With the exception of the term "extremist," we conclude that at common law, as it stood prior to the *Sullivan* case, the editorial as a whole is reasonably susceptible of a defamatory meaning so as to warrant its submission to a jury to determine if, in fact, the defamatory meaning was so understood. Restatement, *supra*, § 614. However, the matter does not end here.

## II

### Constitutional Privilege

[2] Defendants' principal contention supporting dismissal of the complaint is that the statements complained of are expressions of constitutionally privileged "pure opinion." They argue that the editorial describes a set of circumstances and expresses the *Times'* opinion in light of the circumstances. Defendant Greensboro News presents the theory as follows:

> An expression of opinion occurs when the maker of a comment states the facts on which his opinion is based and then expresses a comment on a subject. An assertion that cannot be proved false, such as an opinion, cannot be held libelous. It is only when the underlying material facts upon which an opinion is based are shown to be false that a statement of opinion may become actionable. When the facts upon which the opinion is based are fully set forth in the published com-

munication, or are generally within the knowledge of the parties to the published communication, any expression of opinion is constitutionally protected and absolutely privileged.

From this, defendants conclude that plaintiff's complaint discloses on its face an insurmountable bar to recovery because expressions of editorial opinion may not form the basis for a libel (or invasion of privacy) action consistent with constitutional guarantees of free speech and press. The argument is based largely upon § 566 of the Restatement (Second) of Torts, *Gertz v. Robert Welch, Inc., supra,* and a number of state and federal court decisions interpreting the impact of *Sullivan* and *Gertz* upon the law of libel and the common law privilege of "fair comment" or "privileged criticism." *See* Restatement, Torts, §§ 606, 607 (1938) and Restatement (Second) of Torts, § 580A.

Plaintiff contends that the editorial consists of representations of fact which are capable of being proved false. In the alternative, plaintiff argues that should this Court conclude that the statements are opinion, the First Amendment provides no absolute protection for a newspaper "to make false material statements of fact and then to draw defamatory conclusions therefrom," because such conduct would not advance society's interest in "uninhibited, robust, and wide open debate on public issues." Thus, we must determine what the scope of the absolute constitutional privilege for opinion is, whether the defamatory communications at issue are statements of fact or opinion, and, if opinion, whether they come within the ambit of that constitutional privilege.

We approach these issues with the realization that since *New York Times Co. v. Sullivan, supra,* the principles governing libel actions have developed in recognition of the countervailing interests between the desire for a free and uninhibited press and the law of defamation. In *Sullivan,* the Court recognized that our nation has made a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it will include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," 376 U.S. at 270, 84 S.Ct. at 721, 11 L.Ed. 2d at 701, and created a *qualified* constitutional privilege toward that end. The federal rule established in *Sullivan,* prohibiting a public official

from recovering damages for publications containing factual errors or defamatory content which relate to his official conduct *unless* he proves that the statement was made with "actual malice" was extended to include even characteristics germane to fitness for office which may also affect the official's private character. *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed. 2d 125 (1964). The Court later acknowledged that this constitutional bias toward unfettered speech will often come at the expense of compensation for harm to reputation, at least where a topic of public concern or interest is involved. *Gertz v. Robert Welch, Inc., supra* at 342, 94 S.Ct. at 3008, 41 L.Ed. 2d at 807. However, in *Gertz*, the Court also reiterated its prior rejection of the view that publishers and broadcasters enjoy an unconditional and indefeasible constitutional immunity from liability for defamation in recognition of the fact that underlying the law of libel is the legitimate state interest in the compensation of individuals for the harm inflicted on them by defamatory falsehood. *Id.* at 341, 94 S.Ct. at 3008, 41 L.Ed. 2d at 806.

> We would not lightly require the State to abandon this purpose, for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life, itself, is left primarily to the individual states under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (concurring opinion).

At stake then, are the competing values of the individual's interest in reputation and society's interest in freedom of expression. We next examine the accommodation between these values established in the *New York Times-Gertz* line of cases.

A. False Ideas Under the First Amendment

As Judge Friendly noted in *Cianci v. New Times Pub. Co.*, 639 F. 2d 54, 61 (2d Cir. 1980), the following passage from Justice Powell's opinion for the Court in *Gertz* "has become the opening salvo in all arguments for protection from defamation actions on

the ground of opinion, even though the case did not remotely concern the question."

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

*Gertz*, 418 U.S. at 339-40, 94 S.Ct. at 3007, 41 L.Ed. 2d at 805. However, in the very next sentence Justice Powell stated that there is *"no constitutional value in false statements of fact,"* and continued,

> Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues . . . They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (Citations omitted.)

An illustration of the point regarding the type of opinion that could be corrected by discussion, and thus become entitled to constitutional protection, was taken from Thomas Jefferson's first Inaugural Address:

> "If there be any among us who would wish to dissolve this Union or change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it."

*Id.* at 340 n. 8, 94 S.Ct. at 3007, 41 L.Ed. 2d at 805. In contrast to the foregoing example drawn from the realm of purely theoretical debate on the value of competing political systems, the alleged libels in *Gertz*, considered sufficiently "factual" to warrant remanding the case for a new trial for defamation, included an "implication that petitioner had a criminal record" and charges that he was a "Leninist" or "Communist-fronter." *Id.* at 326, 94 S.Ct. at 3000, 41 L.Ed. 2d at 797-98. The latter expressions took on the nature of factual allegations in the context of an article alleging that plaintiff had been the architect of a communist frameup leading to the conviction of a Chicago policeman.

Two other Supreme Court cases relied upon by defendants are also commonly cited for the creation of a constitutional exception, for statements of opinion, *Greenbelt Pub. Ass'n. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed. 2d 6 (1970), and *Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed. 2d 745 (1974). In *Greenbelt* the defendant newspaper published a series of articles concerning the city's efforts to acquire land for a new school site. One of the articles opened by stating that "[d]elay in construction of a new Greenbelt high school is the lever by which a local developer is pressuring the city to endorse his bid for higher density rezoning of two large tracts of land." A speaker's comment at a city council meeting that plaintiff was "blackmailing" the city in connection with these negotiations was reprinted and adopted by the newspaper. Plaintiff sued on the theory that the articles imputed to him the crime of blackmail. After noting that the articles were full, accurate, truthful reports of the plaintiff's negotiating proposals and what had been said at the public hearings before the city council, Justice Stewart wrote for the Court that no libel had been committed because no one who read the account would have considered that the plaintiff was being charged with the crime of blackmail. The word "blackmail" in this context "was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." 398 U.S. at 14, 90 S.Ct. at 1542; 26 L.Ed. 2d at 15. It is plainly implied that had an accusation of actual criminal wrongdoing been conveyed, it would have been held actionable.

In *Letter Carriers v. Austin, supra*, recovery was sought for a union newsletter's use of the epithet "scab" to describe the plaintiff, and its publication of a well-known Jack London definition of a "scab" as a, "traitor to his God, his country, his family and his class." The Court stated, "[b]efore the test of reckless or knowing falsity can be met, there must be a false statement of fact. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 339-340." *Id.* at 284, 94 S.Ct. at 2781, 41 L.Ed. 2d at 761. "Scab" was held to be a representation of fact (that plaintiffs had refused to join the union), but was not considered actionable because (1) it was both literally and factually true and (2) in its derogatory aspect, it was mere rhetoric, a means by which the union thought it could most effectively make its point. The phrase "traitor to his God, his country" was protected because "traitor" in this context could not

be construed as a false representation of fact. "Such words were obviously used here in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization." 418 U.S. at 284, 94 S.Ct. at 2781, 41 L.Ed. 2d at 762. They were further examples of the "loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like 'unfair' or 'fascist'—[not a falsification of] facts." *Id., quoting from Cafeteria Employees Local 302 v. Angelos*, 320 U.S. 293, 295 (1943). Again, it was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members to those who refuse to join."

The determination of whether statements complained of are representations of fact or expressions of opinion is a matter of law for the court to decide. *Letter Carriers v. Austin, supra; Gregory v. McDonnell Douglas Corp.*, 17 Cal. 3d 596, 131 Cal. Rptr. 641, 552 P. 2d 425 (1976); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y. 2d 369, 397 N.Y.S. 2d 943, 366 N.E. 2d 1299, *cert. denied*, 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed. 2d 456 (1977). Whether an alleged defamatory statement is fact or opinion may depend on the context of the publication. As one court stated, "what constitutes a statement of fact in one context may be treated as opinion in another in light of the nature and context of the communication taken as a whole." *Gregory*, 17 Cal. 3rd at 601, 131 Cal. Rptr. at 644, 552 P. 2d at 428.

Defendant News and Observer argues that editorials by *definition* express the opinions of the newspaper, so that the nature of the publication indicated that the sentiments expressed were opinion, and not fact. Defendant further contends that the sentiments expressed in the *Times'* editorial are "merely rhetorical hyperbole," used in the context of commentary on an issue of public concern and debate. For these reasons defendant argues the editorial falls within the ambit of first amendment protection for statements of opinion.

While it is indisputable that editorials may, and usually do, express the opinions of the newspaper, the fact of publication in the editorial column alone is not determinative. The *Times'* editorial contains nearly as much purely factual information concerning the minority admissions program as it contains expres-

sions of editorial opinion. Paragraphs 3, 4, 5 and 8 primarily contain statistics and information about UNC's admissions practices. The editorial "viewpoint" is expressed primarily by indirection, through a comparison of facts and figures attributed to Hayden Renwick with contrary data obtained by the defendant. Many of the facts disclosed are handled in a loose manner. For example, the *minimum* standard combined score of black students on the Scholastic Aptitude Test is contrasted to the *average* SAT score "for other competitive students." That Hayden Renwick actually charged UNC with unfair discrimination against minorities in his 1978 article is never directly stated, but hinted at repeatedly. The "ridiculous" allegations of discrimination from Washington are never identified specifically, and the basis for the editorial's conclusion that plaintiff's 1978 article was the cause of the latest barrage of these charges in 1981 is unstated. In addition, the source of many of the facts presented in the editorial is not disclosed. Interspersed with the factual data thus loosely presented are the statements and implications complained of. This quasi-reportorial style renders the ordinarily difficult process of distinguishing between representations of fact and expressions of opinion nearly impossible.

The *Greenbelt-Letter Carriers-Gertz* trilogy relied on by defendants to create the constitutional immunity for statements of "opinion" offers little direct guidance on the fact/opinion controversy presented here because the defamatory meaning is largely implied and must be gleaned from a reading of the editorial as a whole. *Letter Carriers* and *Greenbelt* both involved specific words or phrases used in contexts which clearly indicated that the words were employed in their figurative, descriptive senses. On that basis, the plaintiffs' contentions that the words charged them falsely with having committed specific crimes — blackmail and treason — were rejected. With the exception of allegations concerning the term "extremist," rhetorical hyperbole, which by definition is "artificially eloquent exaggeration for effect, not to be taken literally," does not form the basis of plaintiff's claim for defamatory falsehood.[6] To argue that the *sentiments* expressed are *mere hyperbole* is to confuse *what* is expressed with the *form of its expression.*

---

6. *See* Entries for "rhetorical" and "hyperbole," Webster's Third New International Dictionary (Unabridged Ed. 1968).

Thus far, it would appear that the Supreme Court has extended absolute protection to the form — epithet, rhetorical hyperbole, metaphor — in which the speaker or writer chooses to express his judgment, characterization, or evaluation when the context (supporting facts stated) renders it absolutely clear that the derogatory characterization was used in its loose, figurative, or emotive sense and not as a factual assertion of specific misconduct or criminal conduct. This protection for "opinion" in the context of libel actions is analogous to the First Amendment protection extended to the content of speech in other areas of legitimate state regulation of speech. *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed. 2d 284 (1971) is an illustrative case in point. The *Cohen* court held, *inter alia*, that the words "Fuck the Draft" printed on a jacket worn into a Los Angeles courthouse would not support a state conviction for obscene expression because obscene expression must be, in a significant way, *erotic.* *Id.* at 20, 91 S.Ct. at 1785, 29 L.Ed. 2d at 291. In rejecting this literal interpretation of the language, Justice Harlan, writing for the Court, noted:

> It cannot plausibly be maintained that this vulgar allusion to the selective service system would conjure up such psychic stimulation in anyone likely to be confronted with Cohen's crudely defaced jacket.

*Id.* Later, Justice Harlan discussed the figurative, imaginative sense in which the words were employed, observing that in matters of taste and style, "one man's vulgarity is another's lyric."

> [M]uch linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated.

403 U.S. at 25, 26, 91 S.Ct. at 1788, 29 L.Ed. 2d at 294.

In other words, if the offending terminology has no substantive, literal bearing on the content of the expression, the speaker

Renwick v. News and Observer and Renwick v. Greensboro News

cannot be punished solely for his choice of language. In *Greenbelt, supra,* it is clear that had the defendant merely expressed the opinion that Bresler's negotiating position was "extremely unreasonable," the cognitive content of that opinion would have been protected. The only arguably defamatory aspect was the form in which the speaker chose to express the idea. The Supreme Court merely held that protection would not be forfeited because the idea was expressed through a word subject to interpretation as charging criminal conduct. Much the same can be said of the holding in *Letter Carriers v. Austin, supra.*[7] Neither *Letter Carriers, Greenbelt,* nor *Gertz* itself directly analyzed a

---

7. In their briefs defendants cite, without placing principal reliance on, a number of cases to show that opinions far harsher than the *Times'* have been protected under the *Gertz* rule. We have examined these and other cases that our research had disclosed, and find nothing in the rulings inconsistent with our analysis of the scope of the *Gertz* decision's protection for expressions of "opinion." For example, in *National Ass'n. of Gov't. Employees v. Central Broadcasting Corp.,* 379 Mass. 220, 396 N.E. 2d 996 (1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed. 2d 788 (1980), a charge of "communism" was held to be mere pejorative rhetoric, a word too vague to be the subject of a defamation action. The court reasoned that the word was not meant to charge the plaintiff with complicity in the atrocities of Solzhenitsyn's Gulag Archipelago or other horrors distinctive of a totalitarian regime. In the context of its use, "communism" would most likely be taken to be rhetoric, abusive of the plaintiff for what it had done in attempting to squelch criticism. *See also Anton v. St. Louis Suburban Newspapers,* 598 S.W. 2d 493 (Mo. App. 1980) (Editorial characterizing attorney's work in handling a fire district merger as a "sleazy sleight-of-hand" protected as expressing the author's feelings or "opinions" on the issue). Protection is also extended to aesthetic and culinary criticism under a similar rationale. In *Myers v. Boston Magazine,* 380 Mass. 336, 403 N.E. 2d 376 (1980) a statement that plaintiff is "the only newscaster in town who is enrolled in a course for remedial speaking" appeared in humorous "Best and Worst" format. The court held that the amusing format, as well as the ironic use of "is" rather than "ought," made it clear that the device used was no less figurative than a vague epithet or a soaring metaphor, was in the tradition of aesthetic criticism of performers, and was to be protected as mere opinion or ridicule. In *Mashburn v. Collin,* 355 So. 2d 879 (La. 1977) a restaurant reviewer's characterizations of some of the dishes served at the Maison de Mashburn were held to be evaluations of a purely subjective nature, mere expressions of opinion. "[W]hen the author speaks of 'trout a la green plague' and 'yellow death on duck' it is obvious that an ordinarily reasonable person would not infer that these entrees were actually carriers of communicable diseases." *Id.* at 889. *Compare McManus v. Doubleday,* 513 F. Supp. 1383 (S.D.N.Y. 1981) (Statement that plaintiff had "homicidal tendencies" could reasonably be taken in its literal rather than hyperbolic sense by a jury where such words appear in a passage focusing on lobbyists in America connected with the Provisional Irish Republican Army ("IRA"), which was replete with reference to violence and gunrunning). The case on which defendants place principal reliance will be discussed *infra.*

publication defamatory in its cognitive, literal content, as opposed to the stylistic form of its expression under the "opinion" exception.[8]

The gravamen of plaintiff's complaint is that the editorial falsely attributes the statement that 800 blacks were denied admission to him, and proceeds to draw defamatory contrasts and conclusions concerning plaintiff from its own false statement of fact. By means of the structure of the editorial, the *Times* presented an unexplained disparity in the admissions figures purportedly released by Renwick in 1978, and those released in an anonymous "faculty committee" report. The statement,

> [A]llegations by Hayden Renwick . . . that between 1975 and 1978 about 800 black students had been denied admission

was contrasted to,

> [t]he fact that, according to a 1979 faculty committee report, only 36 blacks have been denied access to UNC between 1975 and 1979.

No further information is provided regarding the respective sources or data bases for the two sets of black admissions figures. No direct statement is made that Renwick actually charged UNC with discrimination in his 1978 article, nor is any other background provided regarding his figures. However, Renwick's purported statement regarding admissions is repeatedly characterized as a "charge" of "bias" or "discrimination," and he is clearly classed among the "extremists" who belittle UNC's

---

8. Another decision of note is *Miskovsky v. Oklahoma Pub. Co.*, 654 P. 2d 587 (Okla. Sup. Ct.), *cert. denied,* --- U.S. ---, 103 S.Ct. 235, 74 L.Ed. 2d 186 (1982). During a political campaign the plaintiff, one of several candidates, raised allegations that another candidate, then Governor of Oklahoma, was a homosexual. In a series of editorials and political cartoons the defendant newspaper characterized plaintiff as the campaign "hatchet-man." The court held "hatchet-man" protected as mere epithet, a judgmental and opinionative statement, incapable of constituting a falsehood. Other statements to the effect that the plaintiff "had sunk to a new low in Oklahoma political rhetoric—and for him that takes some doing," were also held protected opinion. Although the United States Supreme Court denied the petitioner's request for review in *Miskovsky*, Justice Rehnquist, joined by Justice White, dissented from the denial on the grounds that the Court did not intend to wipe out the rich and complex history of the common law's attempts to deal with the problem of defamatory "opinion" with the two sentences of *dicta* quoted from *Gertz* regarding "false ideas." --- U.S. at ---, 103 S.Ct. at 236, 74 L.Ed. 2d at 186.

"yeoman" minority admissions efforts and who should be "public-ly rebuffed." By thus hinting at a motive for the release of the 800 figure, the editorial makes it unlikely that the ordinary reader would not conclude that Renwick had dishonestly or reck-lessly released false figures about blacks denied admission because he was dissatisfied with the existing minority admissions policies and practices. In addition, other portions of the editorial refer obliquely to adverse consequences these "irresponsible" charges have had — bringing on an additional "deluge" of charges from Washington — and undoubtedly will have — prospective law-suits against plaintiff's employer.

Thus, a defamatory imputation of personal dishonesty and irresponsibility on the part of an employee in a position of authority at a public university is not expressly stated, but is nonetheless strongly implied. These charges, whether express or implied, go far beyond the mere expression of editorial disagree-ment with those who charge the University with racial discrimi-nation as defendant News and Observer contends. The editorial's contents give no indication that these charges were meant, or would be interpreted, in any but their literal sense. As literal assertions, the implied charges as well as those stated explicitly in the editorial, more nearly resemble the statements found suffi-ciently factual in *Gertz* to support a libel action, than they do the obviously personal evaluations expressed through slogans insuffi-ciently specific, or hyperbole insufficiently literal, to be proved false in *Greenbelt* and *Letter Carriers*.

## B.  Actionable Opinions vs. Generally Derogatory Remarks

[3]  Both defendants argue that statements similar to those in *The Raleigh Times* editorial have been held constitutionally pro-tected by courts in other jurisdictions. We have carefully re-viewed the cases cited in both sets of briefs and principally relied upon to create the broad immunity for statements of "opinion" urged by defendants. As a preliminary matter we note that in no case concerning the protection of statements as mere opinion has a serious question as to the accuracy and truth of the disclosed facts been raised. Our analysis of the cases reveals as essential judicial consensus on the scope of the absolute protection afforded expressions of opinion under the First Amendment which effec-

tively *excludes* accusations of personal dishonesty, misconduct or criminal conduct.

In *Rinaldi v. Holt, Rinehart & Winston, Inc., supra,* the plaintiff, a state court judge, charged the defendants with libel in writing and publishing a book charging the judge with being corrupt and incompetent and advocating his removal from office. The New York Court of Appeals ruled that the charge of incompetence was an expression of opinion regarding the Judge's performance in office, and the advocacy of his removal was an expression of the opinion that the Judge was unfit for his office. Both opinions were entitled to protection, even if falsely and insincerely held, because the writer set forth the basis for his beliefs, thus allowing the reader to draw his own conclusion as to whether the writer's views should be supported or challenged. In short, it was subject to public debate. However, the charges that plaintiff was "probably corrupt" and that his sentences of certain defendants were "suspiciously lenient," were held actionable.

> These words were not used merely in a "loose, figurative sense" to demonstrate Newfield's strong disagreement with some of plaintiff's dispositions . . . The ordinary and average reader would likely understand the use of these words, in the context of the entire article, as meaning that plaintiff had committed illegal and unethical actions. Accusations of criminal activity, even in the form of opinion, are not constitutionally protected . . . While inquiry into motivation is within the scope of absolute privilege, *outright charges of illegal conduct, if false, are protected solely by the actual malice test.* (Citations omitted.) (Emphasis added.)

42 N.Y. 2d at 381-82, 397 N.Y.S. 2d at 951, 366 N.E. 2d at 1307.

The analysis in *Rinaldi,* is based in part upon *Gregory v. McDonnell Douglas Corp., supra. Gregory* concerned a defamation action arising from a labor dispute. At issue were statements in a company bulletin to the effect that plaintiff union officers were apparently willing to sacrifice the interests of the members of their union to further their own political aspirations and personal ambitions. The Supreme Court of California noted that the language of both statements was "cautiously phrased in terms of apparency," and "[m]ore importantly, the charges are of the kind typically generated in the 'economic give-and-take' of a spirited

labor dispute in which the judgment, loyalties and subjective motives of rivals are reciprocally attacked and defended, frequently with considerable heat." 17 Cal. 3d at 603, 131 Cal. Rptr. at 645, 552 P. 2d at 429. The court rejected the plaintiffs' contentions that although statements of opinion regarding their abilities and judgment constitute protected First Amendment speech, attacks on their motivations are not so shielded. However, the court stated, in dictum, that there is a critical distinction between opinions which attribute improper motives to a public official and accusations, in whatever form, that an individual has committed a crime or is personally dishonest. "No First Amendment protection, of course, enfolds the latter charges." *Id.* at 604, 131 Cal. Rptr. at 646, 552 P. 2d at 430.

In *Hotchner v. Castillo-Puche*, 551 F. 2d 910 (2d Cir.), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed. 2d 95 (1977), the statements at issue were unfavorable remarks about the writer A. E. Hotchner (friend of Ernest Hemingway and author of the memoir, *Papa Hemingway*). The author-defendant described Hotchner as a "toady" and a "hypocrite" who was "never open and above board." In the context of discussing the need for the plaintiff to prove that the defamatory falsehoods were made with knowledge of falsity or with reckless disregard for the truth, the court stated that these characterizations, *if viewed in isolation* cannot constitute actionable libel. "A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be." 551 F. 2d at 913. The court also noted that the statements about Hotchner contained no claims that he had engaged in any unusual or outlandish conduct. *Id.* It is apparent that the characterizations "toady" and "hypocrite" fall easily into the category of mere epithet or hyperbole, too loosely definable to carry specific factual content themselves.[9] Therefore, although vituperous, they could not be actionable.

In *Rinaldi, Gregory*, and *Hotchner* statements which the reader would clearly understand to be general evaluations of fitness, loyalty, judgment, subjective motives, and even character,

---

9. This point was specifically recognized by Judge Friendly writing for a different panel of the Court of Appeals for the Second Circuit in *Cianci v. New Times Pub. Co., supra*, 639 F. 2d at 63.

both from the context of the issue discussed and nature of the statement made, have received absolute protection, while more specific charges of particular acts of misconduct or dishonesty have not.

The Second Circuit Court of Appeals reached a similar conclusion in *Cianci v. New Times Publishing Co., supra.* The *Cianci* court reviewed a number of state and federal cases in which the "pure opinion" defense was raised, including an earlier opinion of that court in *Buckley v. Littell*, 539 F. 2d 882 (2d Cir. 1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed. 2d 777 (1977). One of the statements at issue in *Buckley*, contained in the book, *Wild Tongues* (a "timely study of political extremism"), appears as follows:

> Like Westbrook Pegler, who lied day after day in his column about Quentin Reynolds and goaded him into a lawsuit, Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel and nothing else to do.

539 F. 2d at 895. The *Buckley* court held this to be an assertion of the fact that Buckley had lied about and implicitly libeled several people who, if they wanted to and could afford it, would take him to court for his lies. The statement was contrasted to the two other alleged libels; that Buckley was a "fellow traveler of the fascists," or the "right wing" and a deliberate purveyor of material picked up from "openly fascist journals." The former statement could not be considered as factual because of the "tremendous imprecision of the meaning and usage of the terms," and the latter were held to be merely "loosely definable, variously interpretable statements of opinion . . . made inextricably in the context of political, social or philosophical debate." *Id.* at 895.

With regard to the statement comparing Buckley to Pegler, the *Cianci* court interpreted the decision as follows:

> This was considered to be a defamatory assertion of fact namely, that Buckley had made false and libelous statements. After repeating the contrast drawn in *Gertz* between expressions of "pure opinion" and "false statements of fact," the court held the statement was actionable because "the clear meaning to be inferred was that *he considered* Buckley to be

a libeler like Pegler." *Id.* at 896 (emphasis supplied). *Since surely this was a statement of Littell's opinion, our decision must mean that when an "opinion" is something more than a generally derogatory remark but is laden with factual content, such as charging the commission of serious crimes, the First Amendment confers no absolute immunity, as distinguished from the qualified protection accorded by Sullivan in the case of public figures.* And the court did not rest its decision at all on the basis that Littell implied he had reasons for believing Buckley to have been a libeller and defamer other than those disclosed in his articles. (Emphasis added.)

639 F. 2d at 63.

*Cianci* itself involved a libel action brought by an incumbent mayor against a magazine which printed an article stating that the mayor had once been accused of rape, had arranged to have the charges dropped, and had made a payment to the accuser. The defendants' motion to dismiss the complaint under F. R. Civ. P. 12(b) and/or 56 was granted by the district court on the grounds that the article did not directly charge Cianci with the alleged criminal behavior, but principally because to the extent the article implied that Cianci was guilty of rape or improper payoffs, such implications were constitutionally protected as expressions of opinion.

The appellate court reversed the dismissal of the complaint on the grounds that the defendants were not immunized by the constitutional exception for statements of opinion, by the common law privilege of fair comment, or by the constitutional privilege of neutral reportage. The court drew the following conclusion from its review of the relevant cases, 639 F. 2d at 64:

The principle of the *Greenbelt-Letter Carriers-Gertz* trilogy, of our own *Buckley* decision, and of the New York Court of Appeals decision in *Rinaldi* is (1) that a pejorative statement of opinion concerning a public figure generally is constitutionally protected, quite apart from *Sullivan*, no matter how vigorously expressed; (2) that this principle applies even when the statement includes a term which could refer to criminal conduct if the term could not reasonably be so understood in context; but (3) that the principle does not

cover a charge which could reasonably be understood as imputing specific criminal or other wrongful acts.

Applying the fact/opinion distinction set forth in *Gertz*, the court held "a statement that Cianci raped Redick at gunpoint twelve years ago and then paid her in an effort to obstruct justice falls within the [*Gertz*] Court's explication of false statements of fact rather than its illustrations of false ideas where public debate is the best solvent." 639 F. 2d at 62.

The defendant's *organization* of the facts detailing the decision not to prosecute Cianci and the $3,000 payment to the "victim" was itself held susceptible of the foregoing defamatory connotation because the article, so organized, strongly implied that the payment was prior to and was the primary reason for the decision not to prosecute, although it did not state this directly. In fact, the two events had occurred independently of one another. The court concluded that even if the article were to be read as only expressing the "opinion" that Cianci had committed the crimes of rape and obstruction of justice, it is not absolutely protected as distinguished from the protection afforded by *Sullivan.*

> The charges of rape and obstruction of justice were not employed in a "loose, figurative sense" or as "rhetorical hyperbole." A jury could find that the effect of the article was not simply to convey the idea that Cianci was a bad man unworthy of the confidence of the voters of Providence but rather to produce a specific image of depraved conduct — committing rape with the aid of trickery, drugs and threats of death or serious injury, and the scuttling of a well-founded criminal charge by buying off the victim. Such serious charges have not yet become "undefined slogans that are part of the conventional give-and-take in our economic and political controversies." (Citations omitted.) To call such charges merely an expression of "opinion" would be indulge in Humpty-Dumpty's use of language. We see not the slightest indication that the Supreme Court or this court ever intended anything of this sort and much to demonstrate the contrary.

*Id.* at 64.

We are persuaded by the logic and reasoning of the *Cianci* opinion, as well as our analysis of the relevant Supreme Court decisions, that the protection thus far extended to expressions of "mere opinion" under the First Amendment has by no means been interpreted as broadly and comprehensively by other courts as defendants argue. It is clear that many purported statements of "opinion" concerning the personal honesty, integrity, and conduct of individuals have been held sufficiently capable of being proven false to support libel actions for injury to reputation.

Defendants place great reliance upon statements in *Edwards v. National Audubon Society*, 556 F. 2d 113 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed. 2d 498 (1977), protecting use of the epithet "liar" as an expression of opinion concerning the plaintiffs' intellectual honesty. Defendant News and Observer contends that *The Raleigh Times'* editorial does not even contain the epithet "liar," and, to the extent that it expresses an opinion on honesty, the editorial merely questions the intellectual, not moral, honesty of "certain categories of persons."

Two publications were at issue in *Edwards*. The first, a *New York Times* article reporting on serious charges levelled by an official of the Audubon Society against public figures during the midst of a heated and often acrimonious debate over continued use of the insecticide DDT. The second publication was a letter sent to the *Times* by another Audubon official, clarifying the charges. The *Times* article contained portions of a forward to the Society publication *American Birds* reporting the Society's Christmas Bird Count totals. The forward stated that certain paid "scientist-spokesmen" who were citing the bird count totals as proving that birdlife was thriving despite the use of DDT were being "paid to lie." Although the persons under attack were not named in the forward, the *Times* reporter obtained the names from the Society and printed them in the article. The letter of response to the *Times*, which was not published, stated, 556 F. 2d at 119:

Nor do we like to call people liars, but those who have most consistently misused our data [including the appellees] certainly have had time to learn from our patient explanations of their misinterpretations of our data over the several years of the DDT controversy.

The *Edwards* court first analyzed the statements concerning the plaintiffs in the letter. The court held that the reference to the scientists and professors as "liars" was protected as an expression of opinion, reasoning that,

> The epithet "liar" in this context, standing by itself, merely expressed the *opinion that anyone who persisted in misusing the Audubon statistics after being forewarned could not be intellectually honest.* Since the basis of this opinion was fully set forth, the communication of Clement's views cannot be libelous, however mistaken they might be. (Emphasis added.)

556 F. 2d at 121. However, the Audubon Society's principal charges, as reported in *The New York Times*, "went far beyond a mere accusation of scientific bad faith" and actually charged the plaintiffs with being "paid to lie." This was held to be an implication of corruption, requiring a factual basis, which no party to the case was contending existed. *Id.* at 121 n. 5.

The court's reasoning makes it clear that "liar" was used as a rhetorical accusation of scientific bad faith concerning an issue over which opinions may differ — scientifically valid uses of data. That the epithet was merely a stylistic device to express strong disagreement over the plaintiff's use of the data was made clear by the supporting facts stated. Thus, the undertone of personal or moral dishonesty was entirely lacking.

We find no similar ameliorating circumstances present in *The Raleigh Times'* editorial to accompany the imputation of dishonesty arising out of the unexplained disparity between the 800 figure attributed to Hayden Renwick and the 36 figure attributed to the faculty committee. While the editorial clearly does not go so far as to impute corruption to plaintiff, it does go beyond an accusation of mere intellectual dishonesty. Plaintiff is not being charged with what would be the arguable misuse of admissions data, but with the release of absolutely false and misleading data. Had the editorial only expressed disagreement with certain named persons who charged the University with racial discrimination and inadequate affirmative action efforts by charging those persons, in turn, with intellectual dishonesty, such editorial opinions would clearly be protected under the First Amendment. However, a jury could find that the effect of the editorial was not simply to convey the idea that Renwick had taken a demonstrably unrea-

sonable position in the discrimination controversy surrounding UNC, but rather to produce a specific image of dishonest and irresponsible conduct which could only have a divisive effect on the public as well as potentially adverse consequences for the University itself.

These allegations, if stated expressly, would appear sufficiently factual to support a claim for defamation able to withstand the defendants' motions to dismiss the complaint. The California Supreme Court has held that where an article is ambiguous, and cannot as a matter of law be characterized as either stating a fact or an opinion, it is for the jury to determine whether an ordinary reader would have understood the article as a factual assertion charging specific acts of misconduct, or whether the statements were generally understood as an opinion respecting an official's public conduct in regard to a public matter. *Good Government Group v. Superior Court*, 22 Cal. 3d 672, 150 Cal. Rptr. 258, 586 P. 2d 572 (1978), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed. 2d 1066 (1979). *A fortiori* a claim based upon an ambiguous editorial would be sufficient to withstand a motion to dismiss. Notwithstanding any possible ambiguity with respect to the fact/opinion distinction in this case, our examination of the constitutional and legal principles developed in the line of cases beginning with *New York Times Co. v. Sullivan, supra,* leads to the conclusion that even if the editorial were to be read as only expressing the "opinion" that Renwick dishonestly and irresponsibly charged the University with denying admission to 800 black students when, as a "fact," only 36 blacks had been denied access, it is *not absolutely protected* under *Gertz.* Rather, the editorial is protected, if at all, only by the *qualified protection* afforded by *Sullivan* for comment based upon erroneous facts where proof is lacking that the defendant actually knew of the falsity or acted in reckless disregard of the truth or falsity of the assertions. The question of whether plaintiff may ultimately recover under the heavy burden imposed by that standard is as yet wholly premature.

C.  Restatement (Second) of Torts, § 566

[4]  Defendants also argue, in effect, that any implied opinion conveyed by the editorial is protected because the facts which, at least in their view, supported this opinion are set forth in it. Sec-

tion 566 of the Restatement, governing expressions of opinion, states:

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

As acknowledged by the reporter, and demonstrated by the illustrations in the Comments, this statement of the law was arrived at by combining the common law privilege of fair comment with the limited constitutional protection of opinions and ideas developed in the *Gertz, Greenbelt,* and *Letter Carriers* cases.[10] *See* Wade, The Communicative Torts and the First Amendment, 48 Miss. L. J. 671, 694-95 (1977).

In *Cianci v. News Times Pub. Co., supra,* the Second Circuit took the position that neither the pre-Restatement Supreme Court decisions nor the post-Restatement decisions in *Buckley v. Littell, supra, Rinaldi v. Holt, Rinehart & Winston, supra* and the dictum in *Gregory v. McDonnell Douglas Corp., supra,* taken together would protect an "opinion" that conveys a false representation of defamatory fact, such as a direct accusation of criminal misconduct (or personal dishonesty), even where there is no implication that the writer is relying on facts not disclosed. 639 F. 2d 64-5. While disclosure of the supporting facts will often serve as an indication of whether a particular word constituted a direct charge of a crime or a looser protected opinion, such disclosure *alone* will not serve to insulate a direct accusation of criminal misconduct. *Id.* at 65. We note also that the Restatement reporter has acknowledged that the position embodied in § 566, that mere opinion expressed upon disclosed or assumed facts is

---

10. The genesis of new § 566 is discussed in detail in Christie, Defamatory Opinions and the Restatement (Second) of Torts, 75 Mich. L. Rev. 1621 (1977). Professor Christie takes the position that new § 566, in its final form, is logically consistent with the Restatement's own approach to defamation, that the communication must be *factually false as well as defamatory, see* § 588, and with the logic of *Gertz,* that there is no such thing as a "false idea" or "opinion." Under old § 566, a derogatory expression of opinion, although based on disclosed or assumed facts, could be actionable. New § 566 is to the contrary. The section, together with the commentary, encompasses and renders unnecessary old § 567 regarding expressions of opinion on undisclosed facts. In addition, old §§ 606-607 regarding "fair comment" or "privileged criticism" were considered obviated by the new absolute protection for statements of "pure opinion."

not actionable, *may not be accurate* as there has been no clear, firm holding by the Supreme Court to that effect. *Wade, supra* at 705-06.

Wherever the outer limits of First Amendment protection for "opinion" may ultimately lie, it is clear that under the current state of the law, the statements in the *Times'* editorial are not eligible for absolute protection for the reasons stated in Part II, A and B of this opinion. Nor do we find the fact that defendants have disclosed the underlying facts (there being no allusion to other undisclosed defamatory facts which would support the alleged "opinions"), standing alone, to otherwise insulate the editorial for two reasons: (1) the key underlying fact regarding plaintiff's allegation, which forms the subject of the editorial, is alleged to be false in the complaint and (2) the structure of the editorial is such that the disclosed facts do not function to indicate that a particular word constitutes a loose, protected opinion rather than a direct charge; rather, it is the detailing of the facts themselves that could be read as charging plaintiff with dishonesty.

In *Greenbelt, supra,* the Supreme Court carefully noted it was undisputed that the articles published by the defendants were accurate and truthful reports of what had been said at the public hearings before the city council, so that it "cannot even be claimed that the petitioners were guilty of any 'departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers' (Citations omitted), much less a knowing use of falsehood or reckless disregard of whether the statements made were true or false." 398 U.S. at 12, 90 S.Ct. at 1541, 26 L.Ed. 2d at 14. Further, that Bresler's proposal was accurately and fully described in each article, along with the accurate statement that some people at the meetings had referred to the proposal as blackmail. But, the Court specifically stated that had the reports "been truncated or distorted in such a way as to extract the word 'blackmail' from the context in which it was used at the public meetings, this would be a different case." *Id.* at 13, 90 S.Ct. at 1541, 26 L.Ed. 2d at 15. Plaintiff's complaint alleges the falsity of the sole material fact concerning his 1978 statement. From the comparison of that central fact to other data flow the imputations plaintiff claims defamed him. It is not evident from the complaint or the appended editorial in what man-

ner the defendants have falsely represented plaintiff's statement. However, for purposes of reviewing the dismissal of the complaint, it must be taken as true that the newspaper has truncated or distorted plaintiff's statement so as to render the account of it false.

At common law, statements of opinion about matters of public concern were qualifiedly privileged when based upon a true or privileged statement of fact under the doctrine of "fair comment" or "privileged criticism." 1 Harper and James, The Law of Torts, § 5.28, p. 456 (1956); Restatement of Torts, §§ 606, 607 (1938). The requirement of truly stated or privileged facts is explained in Harper and James, *supra* at 458, as follows:

> If the actual facts are accurately stated, an opinion based thereon will be understood as such and taken for what it is worth. In such a case the writer may, by expressing his opinion, "libel himself rather than the subject of his remarks." *But if the facts are misstated, the subject of his remarks is at the writer's mercy, and a defamatory opinion, unless properly labeled, may have the effect of a statement of fact.* (Emphasis added.)

Restatement § 566 appears to incorporate the fair comment requirement of true or privileged disclosed facts in Comment c, at p. 175:

> If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of facts that are not defamatory, he is not subject to liability for the expression of opinion . . . The same result is reached if the statement of facts is defamatory but the facts are true (see § 581B), *or if the defendant is not shown to be guilty of the requisite fault regarding the truth or defamatory character of the statement of facts* (See §§ 580A and 580B), *or if the statement of facts is found to be privileged.* (See §§ 593-612.) (Emphasis added.)

Restatement § 580A, referred to above, covers defamation of public officials or public figures and essentially restates the rule of *New York Times Co. v. Sullivan, supra.* It is commonly acknowledged that the effect of *Sullivan* was to extend application of the privilege of fair comment to misstatements of fact as well as opinion about the conduct of public officials and figures,

unless the plaintiff can prove that the statement was made with knowledge it was false or with reckless disregard of whether it was false or not. *See e.g.* Restatement § 580A, Comment a, p. 215 and Reporter's Notes, p. 458-59; Hanson, 1 Libel and Related Torts, §§ 140, 141 (1969); Note, The Scope of First Amendment Protection of Good-Faith Defamatory Error, 75 Yale L. J. 642, 644-45 (1966).

Thus, where the *Sullivan* standard of fault is applicable, and the issue of opinion upon disclosed facts has been raised, the plaintiff would have the burden of proving that the defendant based his expression of a derogatory opinion of the plaintiff on his own statement of false facts, with knowledge of their falsity or with reckless disregard of whether the facts were false or not. This is essentially the conclusion reached in *Kapiloff v. Dunn*, 27 Md. App. 514, 343 A. 2d 251 (1975), *cert. denied*, 426 U.S. 907, 96 S.Ct. 2228, 48 L.Ed. 2d 832 (1976) in a decision written prior to the redrafting of Restatement § 566.

In *Kapiloff* the plaintiff high school principal sought recovery for alleged libels contained in a newspaper article rating the performance of county high school principals upon source materials set forth in the article. Plaintiff received one of the two "unsuited" ratings based upon the defendant's profile of the educational atmosphere at his school and the effect which the philosophies of the individual principal had on that atmosphere. The plaintiff alleged and offered proof as to the falsity of some of the facts stated by defendants. The court expressly rejected the defendants' argument that the Supreme Court either in *Gertz* specifically or in *Sullivan* or its progeny, has created an absolute privilege for all expressions of opinion on public matters and therefore eliminated the defense of "fair comment," noting that there is language in *Sullivan* to the contrary.[11] 27 Md. App. at 529, 343 A. 2d at 261.

---

11. The Supreme Court stated, 376 U.S. at 292 n. 30, 84 S.Ct. at 732, 11 L.Ed. 2d at 713, "Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that a *defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact.* Both defenses are of course defeasible if the public official proves actual malice, as was not done here." (Emphasis added.) *See also Curtis Publishing Co. v. Butts, supra* at 152 n. 18, 87 S.Ct. at 1990, 18 L.Ed. 2d at 1109.

The Maryland court concluded that both expressions of opinion and statements of fact concerning public officials and public figures can be actionable. Acknowledging the necessary relationship between an opinion and the facts it purports to comment on or interpret, the court concluded that the possible constitutional immunity for commentary must be determined on the basis of the veracity of the underlying facts.

> Where the statements, however, are actual expressions of opinion, based upon stated or readily known facts, their objective truth or falsity depends on the veracity of these underlying facts. Therefore, any determinations with regard to falsity or the presence of actual malice must look to the stated or known facts which form the basis for the opinion.

27 Md. App. at 533, 343 A. 2d at 264. *See also Rand v. New York Times*, 75 A.D. 2d 417, 430 N.Y.S. 2d 271 (1980) (A cause of action for libel will lie for the statement that a singer's recording company, lawyer, and manager "all screwed her at once" when the falsity of the disclosed facts is properly alleged in the pleadings) and *Hotchner v. Castillo-Puche, supra*, 551 F. 2d at 913 (Opinions based on false facts are actionable only against a defendant who had knowledge of the falsity or probable falsity of the underlying facts).

Defendants both cite the decision of this Court in *Brown v. Boney*, 41 N.C. App. 636, 255 S.E. 2d 784, *disc. rev. denied*, 298 N.C. 294, 259 S.E. 2d 910 (1979), as having established a constitutional bar to recovery against a media defendant for statements of opinion made in editorials upon disclosed facts. We do not read the decision quite so broadly. In *Brown* the plaintiff had been involved in an automobile accident, was charged with driving under the influence, and pled guilty to the offense. As a result, his driver's license was revoked. Defendant newspaper editor routinely published the list of license revocations. Plaintiff sought to prevent publication of his name by first attempting to prevent the otherwise routine release of his name from the Department of Motor Vehicles in Raleigh to defendant, and next by pleading personally with defendant not to publish his name. As a result of these and other efforts, defendant published a series of editorial articles accurately chronicling the accident, charges, revocation and plaintiff's efforts to prevent publication of his name in the

newspaper revocation list. A few of the editorials compared plaintiff's efforts to have his name withheld from public scrutiny with "President Nixon's efforts to cover up Watergate." Plaintiff sued for libel and invasion of privacy, presumably on the basis of the metaphorical comparison between his efforts and the Watergate cover-up.

This Court affirmed a directed verdict for the defendant on the grounds that the plaintiff's own evidence tended to show the truth rather than the falsity of the underlying factual statements. In reference to the parallel drawn between plaintiff's admitted actions to prevent publication of his name and the Watergate cover-up this Court stated only that,

> The statements on which plaintiff primarily relies in this case are within the realm of fair editorial comment which has been accorded a significant measure of protection under the First Amendment.

41 N.C. App. at 648, 255 S.E. 2d at 791. Following a reference to *Gertz*, a caveat appeared.

> This does not mean, however, that newspapers or other media defendants can escape liability where the evidence discloses the publication of false factual statements under the guise of editorializing.

*Id.* The case under discussion is clearly distinguishable because the underlying fact is alleged to be false. In addition, as we discussed in Part II, A and B, *supra*, the statements at issue do not come within the measure of absolute constitutional protection for false ideas thus far established.

Defendants' entire argument depends upon acceptance of the premise that "opinions" are incapable of being proven false. However, the editorial opinions at issue, to the extent they are characterizable as such, are readily analyzable for objective truth or falsity according to the formula established in *Kapiloff v. Dunn, supra*, by application of the *New York Times* actual malice test to the underlying facts disclosed therein. As pointed out in *Harper* and *James, supra*, when the facts are misstated, a derogatory opinion, *unless properly labeled*, may have the *effect* of a statement of fact because the subject of the remarks is wholly at the writer's mercy. This is particularly true in plaintiff's

case because any implied editorial opinion is inextricably inter-twined with the supporting facts. A similar situation was presented in *Cianci v. New Times Pub. Co., supra.* There the *organization* of the facts detailed in the article was itself held to be reasonably susceptible of a defamatory connotation, 639 F. 2d at 60, and the court held the common law privilege of fair com-ment to be inapplicable because the opinion was conveyed as part and parcel of the factual disclosures. "In such a case it is mean-ingless to say that the opinion is protected, when the facts are not." *Id.* at 67.

In short, we hold that mere disclosure of the facts upon which the opinions are based will not insulate the newspapers from liability where the facts are alleged to be false, and the detailing of the facts itself gives rise to the defamatory imputa-tions complained of. We agree with plaintiff's contention that the First Amendment provides no absolute protection for a news-paper to make false material statements of fact and then draw defamatory conclusions from them. Nothing in the Supreme Court decisions discussed above leads to the conclusion that such con-duct would serve any "social value as a step to the truth" so as to outweigh the plaintiff's interest in the preservation of his own good name and reputation. We conclude that defendants' editorial is to be protected, if at all, under the *Sullivan* standard for good faith defamatory error. To hold otherwise on the facts of this case would be to sanction a media license to libel public figures far beyond that reasonably alluded to by the Supreme Court in *Gertz v. Robert Welch, Inc., supra.*

### III

### Fair Comment

[5] We will briefly address defendant Greensboro News' argu-ment that the editorial opinions are protected under the privilege of fair comment, inasmuch as we are of the opinion that the privilege retains considerable vitality quite apart from the limited constitutional immunity for "pure opinion" established in *Gertz.*

Our courts have long recognized the privilege of fair com-ment upon matters of public interest, including the activities of public officials or figures. *See e.g. Ponder v. Cobb*, 257 N.C. 281, 126 S.E. 2d 67 (1962); *Yancy v. Gillespie*, 242 N.C. 227, 87 S.E. 2d

210 (1955); *Alexander v. Vann*, 180 N.C. 187, 104 S.E. 360 (1920); *Ramsey v. Cheek*, 109 N.C. 270, 13 S.E. 775 (1891); *Angel v. Ward, supra; Brown v. Boney, supra.* However, the privilege is a matter of the *defense* to an action for defamation. *Alexander v. Vann, supra*; Restatement of Torts §§ 606, 607. Dismissal of the complaint on the grounds that the statements are privileged comment is seldom appropriate because the privilege is only a *qualified* one, defeasible upon a showing that the comments were written with actual malice. *Ponder v. Cobb, supra; Alexander v. Vann, supra; Ramsey v. Cheek, supra.* In *Yancey v. Gillespie, supra*, our Supreme Court recognized the qualified privilege as a constitutional one.

> One of the functions of a newspaper is to give information about public affairs and how public officials are carrying on the public business. So long as that qualified privilege is not abused, an action for libel cannot be maintained. Article I, Sec. 20, of the Constitution of North Carolina provides: "FREEDOM OF THE PRESS. The Freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained, but every individual shall be held responsible for the abuse of the same."

242 N.C. at 229, 87 S.E. 2d at 212.[12]

The Raleigh Times' editorial comments upon, *inter alia*, the veracity and effect of a particular statement published by a public figure concerning an issue of great public concern. Clearly the occasion of its publication would be a privileged one. However, where the complaint contains allegations of actual malice in both the common law and constitutional senses, as does plaintiff's, dismissal my not be premised on the basis of this qualified privilege as defendant contends.[13]

We do not reach the issue of whether the editorial is in fact entitled to protection under the doctrine of fair comment because,·

---

12. The provision of the 1868 North Carolina Constitution quoted in *Yancey* is now embodied in Article 1, § 14 FREEDOM OF SPEECH AND PRESS. (Adopted 1970.)

13. The contrary is true of a complaint which discloses on its face both defamation and facts giving rise to an occasion of absolute privilege. Such a complaint may properly be dismissed for failure to state a claim upon which relief may be granted. *Scott v. Veneer Co.*, 240 N.C. 73, 81 S.E. 2d 146 (1954).

as yet, no responsive pleadings have been filed raising that defense. We hold only that the qualified privilege of fair comment poses no insurmountable bar to plaintiff's recovery in view of the allegations of the complaint.

## IV

### False Light Invasion of Privacy

**[6]** Our courts have long recognized a claim for relief for false light invasion of privacy. *Flake v. News Co., supra* at 791-93, 195 S.E. at 62-64; *Brown v. Boney, supra; Barr v. Telephone Co.*, 13 N.C. App. 388, 185 S.E. 2d 714 (1972). The claim recognized is consistent with Restatement § 652E, entitled "Publicity Placing a Person in False Light," which provides:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

For liability to attach under Section 652E it is essential that the matter publicized be untrue, although it is not necessary for the matter to be defamatory. § 652E, Comment b. It is sufficient if the matter published attributes to the plaintiff characteristics, conduct, or beliefs that are false so that he is portrayed before the public in a false position. *Id.; Brown v. Boney, supra*, at 648, 255 S.E. 2d at 791. An action for defamation and a claim for false light invasion of privacy, however, are closely allied and the same considerations apply to each. *Cibenko v. Worth Publishers, Inc.*, 510 F. Supp. 761 (D.N.J. 1981); Hill, Defamation and Privacy under the First Amendment, 76 Colum. L. Rev. 1205, 1207 (1976). It is for the Court to determine whether the communication in question is capable of bearing a particular meaning which is highly offensive to a reasonable person. *Cibenko, supra* at 766.

Plaintiff ascribes the same meaning to the publication in connection with his false light claim as he does in connection with his defamation claim. For the reasons set forth in connection with the defamation claim, then, this Court finds that the editorial is

reasonably capable of conveying the offensive meaning or the innuendo ascribed by plaintiff as the basis for his invasion of privacy claim. And, for the same reasons that the editorial opinions may predicate a libel action because they are (1) not absolutely protected as "pure opinion" under the First Amendment, (2) are based upon an allegedly false statement of fact and (3) are inextricably intertwined with the allegedly false factual disclosure, thus capable of giving them the effect of false statements of fact upon the reader, they may also predicate a false light invasion of privacy action. Actual malice and damages have been adequately pleaded and the complaint discloses no absolute bar to recovery for plaintiff's second cause of action.

## V

### Republication of Defamation

[7] Defendant Greensboro News contends that plaintiff's claim against it should be dismissed because the "constitutional guaranty of freedom of expression prevents a finding of liability for a newspaper's republication of a syndicated column, absent evidence that the newspaper had good reason to doubt the accuracy of the column." Defendant argues further that absent allegations that the Greensboro News Company had knowledge of material inaccuracies in *The Raleigh Times* editorial, it cannot be held responsible for reprinting the editorial.

We note first that the complaint against the Greensboro News Company in essence alleges:

1. That the Greensboro News Company reprinted and published the false and defamatory statements concerning the plaintiff which had been originally written and published in *The Raleigh Times*.

2. Thereby endorsing and extending the circulation of the defamatory statements.

3. That defendant published said statements with knowledge of their falsity, or with reckless disregard for the truth, and with actual malice.

These pleadings sufficiently allege republication with knowledge of material inaccuracies or in reckless disregard of whether such

statements were inaccurate to withstand defendant's motion to dismiss the complaint.

A federal court has recently referred to the "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement." *Hoover v. Peerless Publications, Inc.*, 461 F. Supp. 1206, 1209 (E.D. Pa. 1978). *Accord Cianci v. New Times Pub. Co., supra*, 639 F. 2d at 60-61. The rule is stated in the Restatement (Second) of Torts, § 578 as "one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." All of the cases cited and relied upon by defendant in its brief essentially established a *defense* to liability for republication on the basis of justified reliance upon the research, writing, or reporting of an author or newspaper of proven professional ability and repute, absent evidence indicating knowledge of inaccuracies. *See e.g. Mistrot v. True Detective Publishing Corp.*, 467 F. 2d 122 (5th Cir. 1972); *Dresbach v. Doubleday & Company*, 518 F. Supp. 1285 (D. D.C. 1981) and *McManus v. Doubleday & Company, supra*. However, the mere fact that such a defense may be available to defendant does not serve to defeat a claim which is adequately pleaded and to which no insurmountable bar to recovery appears from the face of the complaint.

VI

Conclusion

For the foregoing reasons we hold that plaintiff's complaint states a claim for relief for defamation and invasion of privacy against both media defendants. The very organization of the editorial, as well as certain direct statements therein, are reasonably capable of conveying a defamatory meaning. The editorial statements are not absolutely protected under the First Amendment as "false ideas" or "mere opinion" because the defamatory imputations are sufficiently factual to be understood as literal charges of personal dishonesty and irresponsibility. The mere fact that defendants have disclosed the underlying facts upon which the opinions are based is insufficient, standing alone, to insulate the otherwise unprotected expressions of opinion — to the extent that the opinions are reasonably distinguishable from

the facts in the editorial. Furthermore, the alleged falsity of the underlying facts concerning plaintiff, which we must take as false for purposes of testing the sufficiency of the complaint, effectively nullifies the claim of privilege for the opinions based upon disclosed facts as raising an absolute bar to recovery. In such a case the effect on the reader may be tantamount to that of a false statement of fact. It then properly becomes a question for the jury whether the editorial was so understood.

In due regard to the constitutional bias toward a robust, free, and uninhibited press we stress the narrow character of our ruling, namely that the defendants are not absolutely immunized by a constitutional exception for statements of opinion. Beyond that we have discussed the other privileges raised in support of the complaint's dismissal only to demonstrate that these privileges likewise offer no *absolute protection*, as distinguished from the qualified or conditional protection afforded by the *New York Times* case, for the express and implied statements complained of. We therefore conclude that defendant newspapers simply have not demonstrated that an insurmountable bar to recovery for plaintiff's claims is disclosed on the face of the complaint either under the United States Constitution, the North Carolina Constitution or the common law of defamation, and that the complaint gives defendants sufficient notice of the nature and basis of plaintiff's claim to enable them to answer and to prepare for trial. We emphasize that our ruling in no way relieves the plaintiff from the substantial burden imposed by *New York Times Co. v. Sullivan, supra.* We hold only that the trial court erred in dismissing plaintiff's compalint for failing to state a claim.

Reversed.

Judge PHILLIPS concurs.

Judge WELLS dissents.

Judge WELLS dissenting.

When viewed from its four corners, the publication complained of constitutes an expression of opinion regarding activities and comments of a public figure that, in my opinion, is entitled to protection under the Article I, Sec. 14 of the Constitu-

Piney Mt. Neighborhood Assoc. v. Town of Chapel Hill

tion of North Carolina and the First Amendment to the Constitution of the United States. I believe this case to be a fair example of where the public's interest in uninhibited, robust, and open comment is paramount to an individual's interest in protecting his reputation or privacy. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 2d 686 (1964); *compare Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed. 2d 789 (1974); *and Brown v. Boney*, 41 N.C. App. 636, 255 S.E. 2d 784, *disc. rev. denied*, 298 N.C. 294, 259 S.E. 2d 910 (1979).

For these reasons, I must respectfully dissent.