PAUL D. BROWN v. THOMAS E. (TOM) BONEY

No. 7815SC641

(Filed 19 June 1979)

**Libel and Slander § 16— revocation of license for drunk driving—newspaper editorials—no false statements—insufficient evidence of libel**

　In an action to recover damages from defendant newspaper editor and publisher for libel and invasion of privacy, the trial court did not err in directing verdict for defendant where plaintiff's evidence failed to show that any false statements were made by defendant in his editorials concerning plaintiff's attempts to keep his name and news of his driver's license revocation for drunk driving out of the newspaper.

APPEAL by plaintiff from *Bailey, Judge*. Judgment entered 9 February 1978 in Superior Court, ALAMANCE County. Heard in the Court of Appeals on 23 April 1979.

This is a civil action wherein plaintiff seeks damages from the defendant, a newspaper editor and publisher, for libel and invasion of privacy. Plaintiff's evidence tended to show the following:

Plaintiff's general character and reputation in the community where he lives and works is "very good." The plaintiff has lived at 2828 Forestdale Drive in Burlington for approximately 26 years. The plaintiff has "never held any kind of public office" and has "never been rich." On 24 December 1974, plaintiff was driving home when he was involved in an automobile accident in Greensboro, North Carolina. As a result of the accident, plaintiff "was charged with driving under the influence." On 28 January 1975, plaintiff pleaded guilty to the offense and paid a fine of $100.00. Plaintiff's driver's license was revoked for one year, but he was granted "limited driving privileges." Plaintiff subsequently saw a copy of the defendant's newspaper, The Alamance News, and noticed that it contained a listing of the revocation of driver's licenses in it. After ascertaining that the list was made available to the defendant by the local highway patrol office, plaintiff telephoned Mr. Thomas Bunn in Raleigh and "talked with him about the legality of the list." Plaintiff explained to Mr. Bunn that he did not want his name published on the list "because of the humiliation, the embarrassment, and the fear of losing [his]

livelihood." Mr. Bunn did not stop the list of license revocations with plaintiff's name from getting to the defendant, and the list was published in defendant's newspaper. On the evening of 4 March 1975, the day before the list was published, plaintiff telephoned the defendant and "begged . . . and pleaded with him" not to publish the list. Defendant responded that he was going to publish the list. Plaintiff then asked him "not to blow me . . . all out of proportion," but the defendant responded that "he was going to make a story out of it." Each edition of defendant's newspaper for the next eight successive weeks, beginning on 3 March 1975, as well as an edition published on 12 June 1975, contained an editorial article relating to the revocation of plaintiff's driver's license and plaintiff's attempts to prevent the publication of his name in the newspaper on the revocation list. The relevant excerpts from the articles are as follows:

"CORRUPTION IN HIGH PLACES" [6 March 1975]

Paul D. Brown of 2828 Forestdale Drive, Burlington is a man who did not want his name in the newspaper this week.

The 55-year-old white male is listed on the driver's license suspension revocation listing for the week ending February 21 for Troop D, District 5 with a one year suspension from January 28, 1975 through January 28, 1976.

The thing that distinguishes Mr. Brown's case is that one man could possess so much power as to get the democratic processes of our republic form of government changed so rapidly from such high places.

After seeing lists of driver's license suspensions in several other major newspapers, The Alamance News in June, 1969 contacted the Department of Motor Vehicles in Raleigh about carrying the same for Alamance County.

We were informed about getting the list from Raleigh but it was suggested that we get it locally from the State Highway Patrol office. Since we call on them each week in connection with a regular "news beat," this was okay with us. In fact, it has been the practice from the first to loan us their copy which we bring into Graham, have thermofaxed copies made in the courthouse annex, and mail back the original.

The inkling anything was wrong occurred Tuesday morning when The Alamance News reporter was asked by Sergeant V. E. Norwood of the Highway Patrol to return to him both his original and our thermofaxed copies.

The editor immediately telephoned Sgt. Norwood who informed us Mr. Brown had called the patrol office about getting his name omitted from the list published by The Alamance News. Brown was told it was a public record and he would have to contact the newspaper office direct.

Norwood said Brown had been caught "driving drunk" and told him the newspaper had permission to use the list. He checked with his Captain who also "understood it was a public record."

The trooper quoted Brown as saying he was "going to call somebody in Raleigh."

The swiftness of action coming from the top down was amazing. Norwood said the Commissioner of Motor Vehicles, Jacob F. Alexander, told Major Lee Lantz to tell Captain O. R. McKinney of Greensboro to inform Sergeant Norwood "we do not have the right to give out the list."

Norwood further quoted Chapter 20-26 of the General Statutes of North Carolina pertaining to the vehicle law which says we can get the list from Raleigh each week by sending them a dollar each week.

The patrolman added, "I am concerned about it and will be glad to pay you the dollar to write them this week."

Norwood said we also could not get the list in the future except through Raleigh. We could not help but ask the supposed law enforcement officer, "whose side are you on? . . . You get out here and try to get some of these drunken drivers off the road and then come around like this and are trying to shield them?"

The line sergeant for the Alamance County district was sympathetic, indicating it was his personal preference to see Mr. Brown's name appear along with the rest of the list but that effective this week we would have to get the list from Raleigh and again asked for the return of our copy.

The editor asked him to inform his superiors that we had been carrying the list for over six years and refused to return it.

"I am not supposed to have given it out," he maintained.

He also indicated only one list was supplied to him for the Alamance district "and I am not to post it on the bulletin board out here in the future because then it would become a public record."

"I am only asking you not to print it unless you get it from Raleigh," he repeated, "to just hold off for one week . . . It was my error and I should not have permitted you to have it . . . I'd rather pay you the dollar rather than write forty-five letters explaining the error."

Sergeant Norwood's only error is in working for an outfit so chicken it elects to conspire with the law breakers it is supposed to be arresting instead of the decent honest people of North Carolina who are paying for the patrol's services.

We checked the 1974 City Directory and found Mr. Brown was listed as the purchasing agent for Engineered Plastics, a Gibsonville firm.

Tuesday morning at 11 we put in a call to the Motor Vehicles Commissioner and were told by a secretary, "Mr. Alexander just went into a conference and cannot be disturbed." We thanked her, gave her our name, position, and telephone number and asked that he call collect at his convenience.

Having heard nothing by 3:10 p.m. we again called Mr. Alexander and were told he had been given our message "but is gone for the day," (We always try to give everybody two chances to return a call, but we do not allow unreturned calls to "kill a story." Alexander has not called back yet.)

A reporter had, in the meantime, checked the courthouse records and found none listed against Brown. However, the reporter ascertained from Judge J. B. Allen that a one-year revocation was undoubtedly for drunken driving. It could have occurred in some other county.

Our efforts had not gone unnoticed. Tuesday night Brown called the editor at home and began begging and pleading, adding, "I did not mean to hurt you and will help you undo what I've done but only if it is confidential."

. We told him The Alamance News never accepts any comments of any kind at any time off the record—that we exist to have informed readers and not to have informed reporters.

We expressed admiration for his being able to erect so many obstacles in the path of our getting a story.

We told Mr. Brown, as we had earlier told Sergeant Norwood, newspapers have always had to fight all kinds of petty tyrants who wanted to suppress information about themselves while wanting to know everything about others. (Actually, even the drunk drivers want to know who the OTHER drunk drivers are—they just don't want their own misdeeds known.)

Brown said he had called an attorney in Graham about getting his name left off the list and been informed not to approach The Alamance News with such a request "that you can't be approached."

We appreciate such flattery. We are concerned, however, at the "backing down" of so many of our supposed public servants who don't mind feeding at the public trough but who would surrender the public's First Amendment's right to know so quickly. Given a few more days we believe a man like Mr. Brown might have gotten the U.S. Constitution itself either changed or reinterpreted.

He professed to seeing no parallel between President Nixon's efforts to cover up Watergate and his own efforts to have his name withheld from public scrutiny. (When Dick Cooper was solicitor and asked about pressure from drunks not to prosecute he had a famous expression we like to quote "I've never poured one drink into anybody. They've all done that for themselves.")

Mr. Brown said he had a "friend in Raleigh" whom he declined to identify who had done his work for him.

While we are aghast, we marvel that liberties fought for so hard and for long are in such danger. Can you imagine having a story routinely covered for over six years suddenly revoked after we had already gotten it for the current week?

Can you imagine the Highway Patrol, charged with getting drunks off the public streets and highways, in collusion with [sic] trying to suppress information from the top down to the local line sergeant?—And even to the point of not posting the notice? (The Courts have held years ago that any public record that is kept, whether required to be kept or not, is a public record.)

We regret the world has self-centered self-serving people like Paul Brown. We regret that they can reach all the way up to the Commissioner of Motor Vehicles in Raleigh and all the way down to the local highway patrol sergeant.

Maybe we are just a small voice crying out in the wilderness but we hope that those who would corrupt our democratic ideals and institutions someday get their just deserts [sic].

Each year brings forth new ones—so the battle is a never-ending one.

"WRITER'S CRAMP"     [13 March 1975]

Jacob Alexander, N. C. Commissioner of Motor Vehicles, is a man with even less regard for the General Statutes of North Carolina than he has for ordinary common courtesy.

Last week, Alexander developed "dialer's disease" when it came to returning our telephone calls. This week, he developed "writer's cramp" when it came to replying to a letter.

As we noted in an editorial last week, Paul D. Brown of 2828 Forestdale Drive, Burlington, is a man who did not want his name in the newspaper for a license revocation. After objecting to the local Highway Patrol office about releasing the list to us (which we had been carrying regularly for the past six years), he called a "friend in Raleigh" who, somehow or other, decided this could not be done.

The Commissioner notified the Major, who notified the Captain, who notified the Sergeant, who then kicked the dog (that's us). They even had the brass to ask for the return of a copy of the list we had already made, saying it had been turned over to us illegally and they did not mind us using the list if we could get it from Raleigh.

Anticipating they would carry through with their threat of not posting the list on the bulletin board or allow us to see it this week, we wrote Alexander on Friday. We quoted the State law and tendered the $1.00 fee.

To date, we have not heard from either our telephone call, or our letter. When our reporter called at the highway patrol office in Graham this week, our anticipations turned out to be correct about the list vanishing from public view there.

There is an old expression, "a friend in need is a friend indeed."

Apparently, Mr. Alexander is a friend of a friend of Paul Brown's in deed [sic].

What North Carolina motorists need, however, is a friend who will comply with the State's statutes and get some of these drunken drivers off the road instead of coddling them.

               "A 'FRIEND' "          [20 March 1975]

. . .

Paul D. Brown of 2828 Forestdale Drive, Burlington, did not want his name in The Alamance News for a one-year suspension. He called "a friend in Raleigh" who immediately threw wrenches into all the democratic processes known. We called Motor Vehicles Commissioner Jacob Alexander twice about getting the list, and have written him twice, both times officially tendering the $1.00 fee for a list. Mr. Alexander still has the same "phone fright" and writer's cramp he was suffering from last week.

The local State Highway Patrol this week is still not making the list available and refusing to post it on the

bulletin board in an acknowledged attempt to "keep it from becoming a public record." (We pointed out two weeks ago what a shallow meaningless maneuver this was, but the fact remains, we have not been able to get the list.)

The State Highway Patrol may be right in its efforts to suppress the publication of the names of drunk drivers.

All we can see is if the Patrol will do this much for a "friend," how much more are they doing beside the road at the potential arrest scene?

What does it take to become a "friend"?

"MORE ON BROWN COVER-UP" [27 March 1975]

Our efforts to get public information from the Department of Motor Vehicles has finally gotten some action. Not much, really, but something.

Actually, we were just as well off without a reply. Before, we just thought there were some officials in Raleigh without the common decency to return telephone calls or reply to letters. This week, however, Commissioner Jacob Alexander turned our letters over to a J. T. Baker, Jr., director of the Driver License Section.

Mr. Baker wrote:

"Thank you for your letter requesting that you be placed on the mailing list of those receiving the periodic suspension and revocation listings. I regret to inform you I cannot comply with your request as these listings are distributed to law enforcement personnel only . . . Your check in the amount of one dollar, made out to the Division, is attached . . . If you have additional questions regarding this or other matters, please contact me."

. . .

It is all an outgrowth of the efforts of Paul Dennis Brown of 2828 Forestdale Drive, Burlington. He did not want his name published in the Alamance News routine weekly listing or [sic] revocations and suspensions.

. . .

It may very well be the public is not entitled to know who is above the law and getting special treatment. It may be that the public would be better off not knowing what is being cloaked in official secrecy (Watergate notwithstanding).

We were never promised life would be easy if we went into the newspaper business. Like Peter Zenger, we knew keeping public business open to the public would be a never-ending fight because there are too many Paul Browns with "friends" in high places.

It may take us a long time, but until we are ruled wrong, we intend to fight for the right of our subscribers to know what is going on in their government.

We seem to have only a small hold on the tail of a big rat in a deep hole. We would expect the State Highway Patrol to be on our side in trying to get the list publicized, instead of trying to kill it.

When something does not add up, it makes us think that rat may be a lot bigger than even we suspect.

"LESS ABOUT BROWN COVER-UP" [3 April 1975]

No records yet.

"EVEN LESS ABOUT BROWN COVER-UP" [10 April 1975]

No records.

"WORD ABOUT PATROL COVER-UP" [17 April 1975]

Nope.

"OUR OWN WATERGATE!"    [24 April 1975]

Some people apparently figure because they are rich and influential they are better than everybody else. For them, extra special treatment is their due.

When Paul D. Brown of 2828 Forestdale Drive, Burlington, decided he did not want his drunken driving revocation of license for a year in The Alamance News, he called a "friend" in Raleigh.

His friend must really be something because, despite three letters and two phone calls, we still have not been

favored with the list of names we had been getting from the Highway Patrol office regularly for six years. . . .

. . .

We regret people feeding at the public trough feel they have the same rights to privacy about their salaries as those working for private employers, but they do not.

The problems of governmental secrecy—with both the Alamance County manager and the State Highway Patrol —are not new.

Watergate is supposed to be behind us—but maybe it has just come down from Washington to North Carolina!

"ALAMANCE NEWS WINS FIGHT TO GET
          HIGHWAY PATROL LIST"     [12 June 1975]

It has been a hard fight and it has taken us over three months to get it, but elsewhere in this edition The Alamance News is pleased to announce we are again publishing the list of driver's license revocations which the State Highway Patrol in Raleigh has sought so hard to suppress.

The list was finally made available to The Alamance News this week after lengthy negotiations with State officials and, finally, threats of court action.

Tom Boney, publisher of The Alamance News, commented, "it is still hard for the public to understand the issue because you would think the State Highway Patrol would be around asking all of the newspapers in North Carolina to publish the list of license suspensions and revocations. That would be the logical thing to do. Instead, our newspaper has had to fight tooth and nail for over fourteen weeks to get Patrol officials to release it so we could publish it."

Our problems arose when Paul D. Brown of 2828 Forestdale Drive, Burlington, decided he did not want his name in the newspaper for drunk driving.

. . .

We discovered the list was available to us Tuesday and required 11 hours of copying time, plus a corresponding

amount of type-setting time and extra proof reading. Despite this sudden overload we have included all of the lists (with the exception of the week of April 11) this week because we felt our subscribers had already waited long enough for the information. . . .

We started off with a half-page editorial and followed this with three other editorials in March. In April we had successively three-word, two-word, and one-word editorials. When Assistant Attorney General William Melvin ruled partly for us in early May we thought any day we would be getting the list. The red tape in Raleigh is apparently endless.

We regret the public's right to know requires such a battle to substantiate so often (see another editorial also in this issue about public salaries.)

, We shall carry the list on a weekly basis (as we did before March) as we continue to strive to get it in more error-proof form. However, that is an internal consideration of the newspaper.

We feel, however, the public's right to know transcends all other considerations. It is a genuine pleasure to finally be able to present the lists on Pages Six and Seven of this issue.

When plaintiff offered the above editorials into evidence, defendant's objection to the introduction of the first eight editorials on plaintiff's libel claim was sustained. All nine editorials were introduced on plaintiff's invasion of privacy claim.

The effect of these publications was to cause plaintiff to go under a doctor's care in May of 1975 for hypertension. The editorials had some adverse effect on plaintiff's home life. The editorials have hurt plaintiff's self-confidence. Plaintiff lost his job and has been unable to get other employment in Alamance County.

At the close of plaintiff's evidence, defendant, pursuant to G.S. § 1A-1, Rule 50(a), moved for a directed verdict, and this motion was granted. Plaintiff appealed.

*Cahoon & Swisher, by Robert S. Cahoon, for plaintiff appellant.*

*Lassiter and Walker, by William C. Lassiter, for defendant appellee.*

HEDRICK, Judge.

The one question presented by this appeal is whether the court erred in directing a verdict for the defendant at the close of plaintiff's evidence. It is an elementary principle of appellate review that the appellant has the burden not only to show error, but also to show that the alleged error was prejudicial and amounted to the denial of some substantial right. *Gregory v. Lynch,* 271 N.C. 198, 155 S.E. 2d 488 (1967); *Matthews v. Lineberry,* 35 N.C. App. 527, 241 S.E. 2d 735 (1978); 1 Strong's N. C. Index 3d, *Appeal and Error,* § 46.1 (1976). Plaintiff has presented for our review a brief containing thirty-nine pages, the overwhelming majority of which contain a restatement of the allegations of his complaint and a recapitulation of the evidence offered at trial. The function of the brief "is to define clearly the questions presented to the reviewing court and to present the arguments and authorities upon which the parties rely in support of their respective positions thereon." Rule 28(a), Rules of Appellate Procedure. Plaintiff, in his brief, has listed several cases but has made no attempt to relate the cases cited to his one assignment of error or to any argument advanced in support thereof. While the appellant's brief is clearly not in accordance with Rule 28 of the Rules of Appellate Procedure, we nevertheless believe that the question raised by the plaintiff's assignment of error merits some discussion, and thus on our own initiative suspend Rule 28 in order to properly consider it. Rule 2, Rules of Appellate Procedure.

In a libel action, the defamatory statements must be false in order to be actionable, and an admission of the truth of the statement is a complete defense. *Parker v. Edwards,* 222 N.C. 75, 21 S.E. 2d 876 (1942). Likewise, with regard to invasion of privacy of the false light variety, it is essential that the matter published concerning the plaintiff is not true, and it is sufficient if the matter published attributes to him characteristics, conduct, or beliefs

---

**Brown v. Boney**

---

that are false so that he is portrayed before the public in a false position. Restatement 2d, Torts, § 652E (1977).

If the plaintiff's case is to succeed, he must show that the factual statements made concerning him and his actions were false. This he has failed to do. Indeed, the plaintiff's evidence tends to show the truth rather than the falsity of the statements upon which he bases his claim for libel and his claim for invasion of privacy of the false light category. The statements on which plaintiff primarily relies in this case are within the realm of fair editorial comment which has been accorded a significant measure of protection under the First Amendment. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40, 94 S.Ct. 2997, 3007, 41 L.Ed. 2d 789, 805 (1974), the United States Supreme Court stated:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues. [Citation omitted.]

This does not mean, however, that newspapers or other media defendants can escape liability where the evidence discloses the publication of false factual statements under the guise of editorializing. We hold only that the plaintiff's evidence in the present case failed to show any false statements that would entitle him to recover for either libel or invasion of privacy. The trial judge properly directed a verdict for the defendant.

Affirmed.

Chief Judge MORRIS and Judge WEBB concur.