MARTIN MARIETTA CORPORATION, MARTIN MARIETTA AGGREGATES, AND JOHN F. LONG, JR., PLAINTIFFS v. WAKE STONE CORPORATION AND THOMAS B. OXHOLM, DEFENDANTS

No. 9110SC1162

(Filed 3 August 1993)

1. **Libel and Slander § 13 (NCI4th) — permit to construct quarry — document prepared by competition — no libel per se**

A document prepared by the individual defendant with regard to the conditional nature of plaintiff's permits to construct a quarry and with regard to the special treatment defendant felt plaintiff had received as compared to the treatment that defendant corporation had received when it had applied for permits was not defamatory on its face and did not constitute libel per se, since the statements in the document did not accuse plaintiff corporation or its vice-president of improper, unlawful, or unethical acts and practices to obtain the required permits to operate plaintiff's proposed Nash County quarry, but simply recited a history of the permit process in a way which was suceptible of only one meaning, a way which did not disgrace or degrade plaintiff or hold it up to public hatred, contempt or ridicule or cause it to be shunned or avoided.

**Am Jur 2d, Libel and Slander § 315.**

2. **Unfair Competition § 1 (NCI3d) — permit to construct quarry — document prepared and disseminated by competition — unfair and deceptive trade practices claim — summary judgment improper**

The trial court erred in granting defendants' motion for summary judgment on plaintiffs' claim for unfair or deceptive trade practices where there was a genuine issue of material fact as to whether defendants' act of submitting to the Nash County Board of Commissioners a document with regard to the conditional nature of plaintiff company's permits to construct a quarry in Nash County and with regard to the special treatment defendants felt plaintiffs had received as compared to the treatment that defendant company received when it had applied for permits was done in an attempt willfully to destroy or injure plaintiff company's business in Nash County and as to whether defendants were attempting to eliminate

MARTIN MARIETTA CORP. v. WAKE STONE CORP.

[111 N.C. App. 269 (1993)]

any competition from plaintiff company in Nash County. N.C.G.S. §§ 75-1.1, 75-5(b)(3).

**Am Jur 2d, Consumer and Borrower Protection §§ 280 et seq.; Monopolies, Restraints of Trade, and Unfair Trade Practices §§ 496, 602, 696.**

Appeal by plaintiffs from judgment entered 26 September 1991 by Judge A. Leon Stanback, Jr. in Wake County Superior Court. Heard in the Court of Appeals 22 October 1992.

In March 1991, plaintiffs filed a complaint against defendants Wake Stone Corporation and Thomas B. Oxholm, the Vice-President of Planning and Administration of Wake Stone. In their complaint, plaintiffs alleged that defendants libeled, slandered and disparaged plaintiffs in Nash County with statements concerning defendants' business. Additionally, plaintiffs alleged that defendants' statements constituted unfair and deceptive trade practices.

On 31 May 1991, defendants filed an answer to this complaint. In their answer, defendants asserted that the statements made by defendants were true, that the statements made by defendants constituted permissible expressions as opinions based on recited facts, and that defendants have the right to an absolute and qualified privilege.

In June 1991, defendants filed a motion for summary judgment, and on 26 September 1991, the trial court entered an order granting defendants' motion for summary judgment. From this order, plaintiffs appeal.

*Petree Stockton & Robinson, by Ralph M. Stockton, Jr., Jeffrey C. Howard and Stephen R. Berlin, for plaintiff-appellants.*

*McMillan, Kimzey & Smith, by James M. Kimzey, Katherine E. Jean and Martha K. Walston, for defendant-appellees.*

ORR, Judge.

In early 1989, Martin Marietta began the process of locating and opening a rock quarry in Nash County, North Carolina. This process included filing applications with state and local regulatory authorities for various permits that are required. On 1 December 1989, Martin Marietta filed an application for a state mining permit. On 26 February 1990, Steve Conrad, the Director of the Division

MARTIN MARIETTA CORP. v. WAKE STONE CORP.

[111 N.C. App. 269 (1993)]

of Land Resources of the North Carolina Department of Environment, Health, and Natural Resources (the DEHNR), notified Martin Marietta that an environmental assessment was needed in order to review their application for a mining permit because the widening of a state road associated with the proposed quarry would be considered a public expenditure of money.

On 27 February 1990, Assistant Attorney General Philip Telfer sent a memorandum to Conrad, the acting mining specialist within the Land Quality Section of the DEHNR, Tracy Davis, and to Charles Gardner, the Chief of the Land Quality Section of the DEHNR. This memorandum was in response to the DEHNR's inquiry about the requirements of the North Carolina Environmental Policy Act (NCEPA). In this memorandum, Telfer stated that the NCEPA requires that an environmental document be prepared where a project "has a potential for significant environmental impact."

Further, Telfer responded to the Land Quality Section's inquiry about whether a permit could be issued without considering the environmental document if conditions were placed on the permit that would mitigate environmental damage. On this issue, Telfer stated:

It is my opinion that conditions to be placed on the permit being issued may not be the basis for failing to require compliance with [NCEPA]. The purpose of [NCEPA] is to require consideration of environmental information prior to the State action, in this case the issuance of the permit. Thus, [NCEPA] requires the completion of the environmental documentation before it is determined what conditions the State will place on the permit. To do otherwise would vitiate [NCEPA].

On 2 March 1990, Conrad informed Martin Marietta by letter that further information was needed before determining whether NCEPA applied to its proposed quarry. On 23 March 1990, Telfer sent a memorandum to Conrad stating that if Martin Marietta placed a bond to cover any damage to the roads caused by it exceeding the posted weight limits, these weight limits would be removed. Further, Telfer stated that Martin Marietta had promised to place this bond. Based on these statements, Telfer told Conrad that a permit could be issued to Martin Marietta without an environmental assessment.

On 26 March 1990, Acting Mining Specialist Tracy Davis sent a memorandum to Conrad with a proposed draft permit recommending that Martin Marietta's permit be approved with certain conditions. Davis noted that Martin Marietta had applied for an air quality permit and a NPDES (water discharge) permit but had not yet received them. The mining permit was issued the same day to Martin Marietta with the condition that Martin Marietta comply with the State water and air quality regulations. On 28 March 1990, Marvin Pridgen, the Nash County Planning Director, issued Martin Marietta a Land Use Permit.

Subsequently, the Nash County Board of Commissioners (the "Board") had been considering zoning the area containing plaintiffs' proposed quarry site. On 3 January 1990, Martin Marietta sent a letter to the Nash County Office of County Planning requesting that the tract of land including their proposed quarry site "be designated as a heavy industrial, mineral mining and processing category." On 16 January 1990, the Planning Board held a meeting to discuss, among other things, the proposed zoning of this land. On 19 March 1990, the Planning Board held another meeting where they discussed the zoning of this property, and the members voted unanimously to recommend that it be zoned as A-1, Agricultural District. Martin Marietta then applied to the Board for an exemption to the proposed zoning regulation so that it could place the quarry on this land as a non-conforming use.

Since the Spring of 1989, defendant Wake Stone has owned and operated a rock quarry in Nash County. After learning that Martin Marietta had been issued a conditional land use permit and that the Board was going to consider Martin Marietta's application for an exemption to the proposed zoning regulation, defendant Thomas Oxholm, Wake Stone's Vice President of Planning and Administration, telephoned Commissioner Martin, a member of the Board. Oxholm informed Commissioner Martin of the conditional nature of plaintiffs' permits and of the special treatment he felt Martin Marietta had received as compared to the treatment that Wake Stone had received when it had applied for permits.

At the request of Commissioner Martin, Oxholm put his comments in writing. Subsequently, the statements in this document (the "Document") are the subject of this complaint. The Document states:

MARTIN MARIETTA CORP. v. WAKE STONE CORP.

[111 N.C. App. 269 (1993)]

INFORMATION CONCERNING MARTIN MARIETTA CORPORATION'S MINING PERMIT AND RECEIPT OF A NASH COUNTY LAND USE PERMIT

1. MARTIN MARIETTA RECEIVED A MINING PERMIT DATED MARCH 26, 1990. THE PERMIT WAS ISSUED BY STEVE CONRAD, DIRECTOR OF THE DIVISION OF LAND RESOURCES. A DIVISION OF THE DEPARTMENT OF ENVIRONMENT, HEALTH AND NATURAL RESOURCES. THE DEPARTMENT MAY DENY A PERMIT REQUEST UPON FINDING . . .:

"(3) THAT THE OPERATION WILL VIOLATE STANDARDS OF AIR QUALITY, SURFACE WATER QUALITY, OR GROUND WATER QUALITY . . . ."

SPECIFICALLY, THE DEPARTMENT REQUIRES A NUMBER OF ADDITIONAL PERMITS, WHICH IN THIS CASE INCLUDES A NPDES WATER DISCHARGE PERMIT AND A NSPS AIR POLLUTION DISCHARGE PERMIT. NEITHER OF THESE PERMITS HAVE BEEN ISSUED AND ARE NOT EXPECTED FOR AT LEAST 30 DAYS.

HOW CAN THE LAND RESOURCES DEPARTMENT ISSUE A MINING PERMIT BEFORE THEY KNOW WHETHER AN OPERATION WILL MEET THE CRITERIA OF ITEM 3 ABOVE?

PER TRACY DAVIS, ACTING MINING SPECIALIST, IT HAS BECOME STANDARD PRACTICE TO ISSUE THE PERMIT BEFORE AIR AND WATER PERMITS, WITH THE COMPANY BEING NOTIFIED THAT THE PERMIT IS ONLY VALID UPON THE RECEIPT OF THOSE ADDITIONAL PERMITS.

MARTIN MARIETTA PRESENTED THE MINING PERMIT TO MARVIN PRIDGEN AND REQUESTED A LAND USE PERMIT FOR ITS QUARRY PREPARATION KNOWING THAT THE PERMIT WAS NOT VALID UNTIL THE OTHER PERMITS WERE RECEIVED. THE LAND USE PERMIT WAS ISSUED BUT DUE TO WET WEATHER NO WORK HAS YET BEGUN.

IT SHOULD BE NOTED THAT THE PERMIT WAS SPECIALLY HANDLED BY STEVE CONRAD, BYPASSING TRACY DAVIS, AT THE REQUEST OF JOHN LONG, VICE PRESIDENT OF MARTIN MARIETTA AND A MEMBER OF THE NORTH CAROLINA STATE MINING COMMISSION. MR. CONRAD RETIRES FROM STATE GOVERNMENT ON FRIDAY, MARCH 30, 1990.

THE PERMIT USUALLY TAKES 30 DAYS TO BE ISSUED FOLLOWING THE RESOLUTION OF ALL PENDING MATTERS. IN THIS CASE THE

PENDING MATTER WAS THE ENVIRONMENTAL ASSESSMENT STUDY REQUESTED OF MARTIN MARIETTA. THIS ISSUE WAS RESOLVED BY A LETTER FROM THE ATTORNEY GENERAL'S OFFICE TO STEVE CONRAD DATED FRIDAY, MARCH 23, 1990. ON THE FOLLOWING MONDAY THE PERMIT WAS DRAFTED, TYPED, REVIEWED, RECLAMATION BOND POSTED, APPROVED AND SIGNED BY MR. CONRAD. (NOTE: BE SURE TO SEE ATTACHED COPIES OF RELATIVE INFORMATION FROM THE MARTIN MARIETTA FILE INCLUDING A DRAFT OF THE CONDITION RESOLVING THE USE OF PUBLIC FUNDS FOR THE PROJECT, A.K.A. THE ENVIRONMENTAL ASSESSMENT ISSUE — THE DRAFT WAS WRITTEN BY STEVE CONRAD).

2. THE COUNTY IS CONCERNED ABOUT BEING SUED BY MARTIN MARIETTA FOR THEIR VESTED INTEREST IN THE QUARRY LOCATION. PER MR. DAVID OWENS AT THE INSTITUTE OF GOVERNMENT IN CHAPEL HILL . . ., AN ENTITY DOES NOT HAVE A VESTED INTEREST UNTIL ALL PERMITS ARE RECEIVED. THEN THEIR VESTED INTERST [SIC] BECOMES EXPENDITURES FROM THAT TIME FORWARD. NOT PRIOR EXPENDITURES. FROM AN EXPLANATION OF THE FACTS OF THE PERMITTING VERSUS ZONING SITUATION MR. OWENS STATED THAT THERE WAS DEFINITELY NO CLEAR CUT CASE WHICH WOULD SET PRECEDENCE. THE ISSUANCE BY THE COUNTY OF THE LAND USE PERMIT COULD BE THE MOST DAMAGING EVENT SO FAR. ONLY THE PROMPT REVOCATION OF THAT PERMIT WOULD STOP ANY VESTED INTERESTS (EXPENDITURES) FROM ACCRUING.

3. WAKE STONE CORPORATION WAS TOLD BY MARVIN PRIDGEN THAT WHEN IT HAD ALL ITS PERMITS, IT COULD GET A LAND USE PERMIT FROM THE COUNTY. THE MINING PERMIT WAS ISSUED NOVEMBER 1, 1989. ALL OTHER PERMITS WERE RECEIVED JUST PRIOR TO CHRISTMAS, 1989. A LAND USE PERMIT WAS APPLIED FOR AND RECEIVED IN JANUARY, 1990. LAND PREPARATION COULD HAVE BEGUN ALMOST THREE MONTHS EARLIER.

4. WAKE STONE CORPORATION DOES NOT EXPECT THE COMMISSIONERS TO HANDLE THEIR COMPETITION FOR THEM. HOWEVER, WE BELIEVE IT ONLY FAIR THAT ALL APPLICATIONS BY INDUSTRY BE HANDLED FAIRLY AND IN THE SAME MANNER, NOT IN A WAY WHICH CAN BE BYPASSED BY POLITICAL INFLUENCE OR PRESSURE. WE BELIEVE THE VOTERS, TAXPAYERS AND ALL CITIZENS WOULD EXPECT THE SAME MANNER OF CONDUCT.

After Oxholm created this Document, Commissioner Martin came by Oxholm's office and picked it up. Then, Oxholm and John

Bratton, the President of Wake Stone, distributed the Document to Commissioners Robert Siler, Claude Mayo, and Tommy May. Oxholm also delivered copies to Marvin Pridgen, to an attorney for Nash County, James W. Keel, Jr., and to a citizen opposing the Martin Marietta zoning exemption, Kathy Smith. Commissioner Siler took responsibility for delivering the Document to Commissioners Billy Morgan, Kermit Richardson and James Odom.

On 2 April 1990, a public hearing was held, and the Board voted to zone the tract of land including the plaintiffs' proposed quarry site as A-1 Agricultural. Additionally, the Board voted to exclude Martin Marietta from a list of proposed non-conforming uses for this area. On 9 April 1990, Marvin Pridgen revoked Martin Marietta's land use permit, thereby preventing Martin Marietta from opening their quarry.

Subsequently, plaintiffs filed this suit for libel and unfair and deceptive trade practices against defendants alleging that defendants' statements in the Document were the proximate and direct cause of the Board's decisions to zone the land containing their proposed site for a quarry, to remove Martin Marietta from the proposed list of non-conforming uses, and to revoke Martin Marietta's land use permit.

Defendants filed their answer, claiming that their statements were true, that their statements constituted permissible expressions as opinions based on recited facts, and that their statements were covered by an absolute and qualified privilege, and they filed a motion for summary judgment. On 26 September 1991, the trial court granted defendants' motion for summary judgment. For the reasons stated below we affirm in part and reverse in part the decision of the trial court.

I.

Plaintiffs contend that the trial court erred in granting defendants' motion for summary judgment as to all of their claims. Summary judgment is the device whereby judgment is rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.R. Civ. P. 56(c). "Summary judgment is proper when it appears that even if the facts as claimed by plaintiff are taken as true, there can be no

recovery." *Hudson v. All Star Mills, Inc.*, 68 N.C. App. 447, 450, 315 S.E.2d 514, 516, *disc. review denied*, 311 N.C. 755, 321 S.E.2d 134 (1984). "Thus a defending party is entitled to summary judgment if he can show that claimant cannot prove the existence of an essential element of his claim, . . . or cannot surmount an affirmative defense which would bar the claim." *Dickens v. Puryear*, 302 N.C. 437, 453, 276 S.E.2d 325, 335 (1981) (citation omitted). "In ruling on a motion for summary judgment the evidence is viewed in the light most favorable to the non-moving party." *Hinson v. Hinson*, 80 N.C. App. 561, 563, 343 S.E.2d 266, 268 (1986).

## II.

[1] First, plaintiffs contend the trial court erred in granting defendants' motion for summary judgment on plaintiffs' libel claim. We disagree.

Summary judgment would be proper for defendants if they could show that plaintiffs could not prove the existence of an essential element of their claim or that plaintiffs could not surmount an affirmative defense which would bar the claim. Plaintiffs allege that defendants' statements in the Document constitute libel *per se* based on the argument that these statements impeach them in their trade or profession.

> [A] publication is libelous *per se*, or actionable *per se*, if, when considered alone without innuendo: (1) It charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to ridicule, contempt, or disgrace, or (4) it tends to impeach one in his trade or profession.

*Ellis v. Northern Star Co.*, 326 N.C. 219, 224, 388 S.E.2d 127, 130 (1990); *Flake v. Greensboro News Co.*, 212 N.C. 780, 787, 195 S.E. 55, 60 (1938).

Further, "[w]hether a publication is one of the type that properly may be deemed libelous *per se* is a question of law to be decided initially by the trial court." *Ellis, supra*. Additionally, "[i]n a libel action, the defamatory statements must be false in order to be actionable, and an admission of the truth of the statement is a complete defense." *Brown v. Boney*, 41 N.C. App. 636, 647, 255 S.E.2d 784, 791, *disc. review denied*, 298 N.C. 294, 259 S.E.2d 910 (1979).

## MARTIN MARIETTA CORP. v. WAKE STONE CORP.

[111 N.C. App. 269 (1993)]

In their complaint, plaintiffs alleged that the statements in the Document accused Martin Marietta and John Long of "various improper, unlawful and unethical acts and practices allegedly undertaken to obtain the required permits to operate Martin Marietta's proposed Nash County quarry" and that these statements damaged plaintiffs' business relationships. Based on these allegations, plaintiffs contend the Document is defamatory on its face and constitutes libel *per se*. We do not agree.

" '[D]efamatory words to be libelous *per se* must be susceptible of *but one meaning* and of such nature that *the court* can presume *as a matter of law* that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided.' " *Renwick v. News and Observer Publishing Co.*, 310 N.C. 312, 317-18, 312 S.E.2d 405, 409, *cert. denied*, 469 U.S. 858 (1984) (emphasis in original) (quoting *Flake*, 212 N.C. at 786, 195 S.E. at 60).

In determining whether these statements are susceptible of only one meaning and that this meaning is defamatory so as to constitute libel *per se*, this Court must look at how the ordinary person would understand these statements.

> The principle of common sense requires that courts shall understand them as other people would. The question always is how would ordinary men naturally understand the publication .... The fact that supersensitive persons with morbid imaginations may be able, by reading between the lines of an article, to discover some defamatory meaning therein is not sufficient to make them libelous.
>
> In determining whether the article is libelous *per se* the article alone must be construed, stripped of all insinuations, innuendo, colloquium and explanatory circumstances. The article must be defamatory on its face "within the four corners thereof."

*Renwick*, 310 N.C. at 318, 312 S.E.2d at 409 (quoting *Flake*, 212 N.C. at 786-87, 195 S.E. at 60).

When viewed within the "four corners" of the Document and stripped of all innuendo and explanatory circumstances, we cannot say that the statements are of such a nature that the court can presume as a matter of law that they tend to disgrace and degrade plaintiffs or hold them up to public hatred, contempt or ridicule,

or cause them to be shunned and avoided. Further, they are not susceptible of only one meaning which meaning is defamatory as a matter of law.

Additionally, as to plaintiff John Long, the only reference to John Long in the Document is found in the statement: ·

IT SHOULD BE NOTED THAT THE PERMIT WAS SPECIALLY HAN-DLED BY STEVE CONRAD, BYPASSING TRACY DAVIS, AT THE RE-QUEST OF JOHN LONG, VICE PRESIDENT OF MARTIN MARIETTA AND A MEMBER OF THE NORTH CAROLINA STATE MINING COM-MISSION. MR. CONRAD RETIRES FROM STATE GOVERNMENT ON FRIDAY, MARCH 30, 1990.

The ordinary reader could interpret this statement just as the plain words state, that Long merely requested a member of the DEHNR to personally handle the permit himself so that it would be processed correctly and efficiently. No accusation of "various improper, unlawful and unethical acts and practices" in the context of the Document appear clearly on the face of the Document as plaintiffs allege.

Thus, these statements are not so "obviously defamatory" so as to sustain plaintiffs' action for libel *per se*. *See, Morris v. Bruney*, 78 N.C. App. 668, 674, 338 S.E.2d 561, 565 (1986) ("A publication is defamatory *per se* . . . if its injurious or defamatory character is *clear and obvious* from the words alone.") (Emphasis added.); *See also, Robinson v. Nationwide Ins. Co.*, 273 N.C. 391, 395, 159 S.E.2d 896, 899 (1968) (holding that "the statement that one's automobile liability insurance policy has been cancelled because of 'infavorable [sic] personal habits' is not so obviously defamatory as to meet the requirements" of the test for libel *per se*).

Plaintiffs argue, however, that these statements constitute libel *per se* based on the holding in *Ellis, supra.* In *Ellis*, the plaintiff company was a food broker. As such, the company's function was "to convince large-quantity food buyers, such as hospitals and school systems, to place orders with the company's clients who are in the business of selling foods." *Ellis*, 326 N.C. at 221, 388 S.E.2d at 128. The defendant company was a potato processor for which the plaintiff company was a food broker.

Subsequently, the plaintiff company received defendant com-pany's potato pricing information over the telephone, and Ellis, the sole full-time employee of plaintiff company sent a price list

MARTIN MARIETTA CORP. v. WAKE STONE CORP.

[111 N.C. App. 269 (1993)]

based on this information to several potential buyers. The senior vice-president in charge of sales for defendant company sent a letter to several of the buyers who had received this price list which stated:

> We have recently received copies of a price list sent to you from [plaintiff company] regarding pricing on [defendant company's] products. These prices were noted for *bids only*, delivered by [defendant company].

> We at [defendant company] did not authorize such a price list and therefore cannot honor the prices as quoted. . . .

*Id.* at 222, 388 S.E.2d at 129 (emphasis in original).

Plaintiff company and Ellis filed an action against defendant company and its senior vice-president for sales alleging that this letter constituted libel *per se* and an unfair or deceptive act affecting commerce under N.C. Gen. Stat. § 75-1.1. The trial court directed a verdict in favor of defendants on all but the libel claims, and the jury found that the defendants had maliciously libeled the plaintiff company but had not libeled Ellis. Defendants appealed.

Defendants argued that the letter was not defamatory at all or, alternatively, that it was susceptible of both defamatory and nondefamatory interpretations. Our Supreme Court held that the letter constituted libel *per se* and stated:

> The language "[w]e at [defendant company] did not authorize such a price list," taken in the context of the entire letter, can only be read to mean that [plaintiff company], acting in its capacity as broker for [defendant company], did an unauthorized act. Whether that act was publishing certain unauthorized prices within a price list or publishing the entire price list itself without authorization is of no import; either reading is defamatory and impeaches [plaintiff company] in its trade as a food broker.

*Id.* at 224, 388 S.E.2d at 130. Further, the Court held that "a libel *per se* of a type impeaching a party in its business activities is an unfair or deceptive act in or affecting commerce in violation of N.C.G.S. § 75-1.1, which will justify an award of damages under N.C.G.S. § 75-16 for injuries proximately caused" so long as plaintiffs are able to show they suffered actual injury. *Id.* at 226, 388 S.E.2d at 131.

Unlike the language in the present case, the language in *Ellis* which the Court determined constituted libel *per se* <u>directly</u> charged that the plaintiff company had committed an unauthorized act, no matter how the language was interpreted, and it impeached the company in its business as a food broker by potentially affecting its business relationship with buyers. In the present case, the language in the Document does not directly charge plaintiffs with an unauthorized act, or with improper, unlawful or unethical acts or practices as plaintiffs alleged. Further, the record contains no evidence to show that the language in the Document "impeached" Martin Marietta in its business of mining.

Accordingly, we find that plaintiffs' reliance on *Ellis* is unfounded and affirm the decision of the trial court granting defendants' motion for summary judgment as to plaintiffs' claim for libel.

III.

[2] Plaintiffs also contend that the trial court erred by granting defendants' motion for summary judgment on plaintiffs' claim for unfair or deceptive trade practices. We agree.

At the outset we again note the standard for granting a summary judgment motion. Defendants would be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that [defendants are] entitled to a judgment as a matter of law." N.C.R. Civ. P. 56(c).

In the present case, the affidavits, depositions, and answers to interrogatories show that there is no genuine issue as to the following facts: On 1 December 1989, Martin Marietta filed an application for a state mining permit so that it could operate a rock quarry on land located in Nash County. On 26 February 1990, Steve Conrad, the Director of DEHNR, notified Martin Marietta that an environmental assessment was needed in order to review their application. On 23 March 1990, Assistant Attorney General Telfer sent a memorandum to Conrad stating that Martin Marietta was going to place a reclamation bond to cover any damage to the roads caused by it exceeding the posted weight limits and that these weight limits could be removed. Based on these statements, Telfer also stated that a permit could be issued to

Martin Marietta without an environmental assessment. On 26 March 1990, Martin Marietta posted a reclamation bond.

Also on 26 March 1990, Acting Mining Specialist Tracy Davis sent a memorandum to Conrad with a proposed draft permit recommending that Martin Marietta's permit be approved with certain conditions. Davis noted that Martin Marietta had applied for an air quality permit and a NPDES (water discharge) permit but had not yet received them. The mining permit was issued the same day to Martin Marietta with the condition that Martin Marietta comply with the State water and air quality regulations. On 28 March 1990, Marvin Pridgen, the Nash County Planning Director, issued Martin Marietta a Land Use Permit.

Further, since approximately May 1989, at the request of the Nash County Board of Commissioners, a committee formed from the County Planning Committee had been considering zoning certain unzoned lands, including the land containing the proposed quarry site. By letter dated 3 January 1990, Martin Marietta asked the Office of County Planning to zone this area as heavy industrial mineral mining and processing. On 16 January 1990, the Nash County Planning Board held a hearing on the zoning issue where a representative of Martin Marietta and some other citizens spoke in favor of the quarry. Numerous other people, however, expressed their concerns about the rock quarry.

On 19 March 1990, the Planning Committee held another hearing on the zoning issue. At this hearing, Martin Marietta asked the Committee to recommend zoning the area containing the proposed quarry site as MI conditional use to operate a rock quarry. The Committee rejected this proposal. Martin Marietta did not own the property at this time. Subsequently, the Planning Committee recommended to the Board of Commissioners that this area be zoned as A-1 Agricultural and that Martin Marietta be removed from the list of non-conforming uses because all their permits had not been issued.

A regular meeting of the Board of Commissioners was scheduled for 2 April 1990, at which the Board was to consider the recommendation of the Planning Committee. Before this meeting, the Vice-President of Planning and Administration of Wake Stone, defendant Oxholm, prepared the Document set out previously and gave it to the Chairman of the Board. At the meeting of 2 April 1990, the Board voted to affirm the Planning Committee's recom-

mendation and zoned the area containing the proposed quarry site as A-1 Agricultural. Further, the Board voted four to three to exclude Martin Marietta from the list of non-conforming uses. By letter dated 9 April 1990, Marvin Pridgen informed Martin Marietta of the Board's decision and revoked their land use permit, thereby preventing Martin Marietta from opening the quarry. Martin Marietta contends that defendants' act of submitting this Document to the Board constitutes an unfair and deceptive trade practice under N.C.G.S. §§ 75-1.1, -5(b).

N.C. Gen. Stat. § 75-1.1(a) states, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-5(b)(3) states:

> (b) In addition to the other acts declared unlawful by this Chapter, it is unlawful for any person directly or indirectly to do . . . any of the following acts:
>
> . . .
>
> (3) To willfully destroy or injure, or undertake to destroy or injure, the business of any competitor or business rival in this State with the purpose of attempting to fix the price of any goods when the competition is removed.

"To prevail on a claim of unfair and deceptive trade practice a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Spartan Leasing, Inc. of North Carolina v. Pollard,* 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991).

"The concept of 'unfairness' is broader than and includes the concept of 'deception.'" *Johnson v. Phoenix Mut. Life Ins. Co.,* 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscruplous [sic], or substantially injurious to consumers." *Id.* "Specifically, '[a] party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position.'" *Bolton Corp. v. T.A. Loving Co.,* 94 N.C. App. 392, 411-12, 380 S.E.2d 796, 808, *disc. review denied,* 325 N.C. 545, 385 S.E.2d 496 (1989) (citations omitted). Additionally, "[w]hether a particular act

MARTIN MARIETTA CORP. v. WAKE STONE CORP.

[111 N.C. App. 269 (1993)]

is unfair or deceptive is a question of law for the court." *Id.* at 411, 380 S.E.2d at 808.

In the present case, the president of Wake Stone, John Bratton, testified in his deposition that when he found out that Martin Marietta and another mining company were interested in quarry sites in Nash County, he was of the opinion that it would be difficult for the market in Nash County to support three new quarry operations. Further, he testified that he followed the process of plaintiffs' application for a permit by contacting the Land Quality Section of the DEHNR and asking about the status of plaintiffs' application.

Subsequently, when Bratton found out Martin Marietta had received its mining permit and that the Nash County Board of Commissioners was going to vote on the zoning of the proposed quarry site, he helped Oxholm prepare the Document. Further, Bratton testified that he delivered the Document to various Commissioners the Friday evening before the Board meeting on Monday where the Commissioners decided to zone the land containing plaintiffs' proposed quarry site as A-1 Agricultural and to exclude Martin Marietta from the list of non-conforming uses. Bratton helped prepare the Document and delivered it, even though Bratton testified in his deposition that he had no basis to believe that Martin Marietta had acted improperly in obtaining their state mining permit or to believe that John Long exerted any improper influence to obtain this permit.

In Oxholm's deposition, when asked whether he meant to indicate in the Document to the Commissioners of Nash County that Martin Marietta had bypassed ordinary procedures through political influence to obtain the mining permit, Oxholm stated:

> I CAN SEE HOW THE READING OF IT COULD GIVE THE INDICATION. THE FACT OF THE MATTER IS IN OUR KNOWLEDGE OF MARTIN MARIETTA AND HOW THEY OPEN MANY NEW QUARRIES IS THAT THEY ARE VERY ACTIVE WITH LAW FIRMS WITH POLITICAL INFLUENCE, AND THAT IT WAS NOT UNUSUAL FOR THEM TO USE A VERY HIGHLY POLITICAL LAW FIRM IN THE LOCATIONS WHERE THEY WENT, WHICH THEY DID IN THIS CASE; AND THAT THE APPEARANCE OF THINGS THAT OCCURRED IN THE LAST WEEK AT THE LAND RESOURCES DIVISION WERE VERY UNUSUAL.

Based on these facts, we hold that there is a genuine issue of material fact as to whether defendants' act of submitting the

Document to the Board was done in an attempt to willfully destroy or injure plaintiffs' business in Nash County and as to whether Wake Stone was attempting to eliminate any competition from Martin Marietta in Nash County. Thus, there are genuine issues of material fact as to whether defendants' act constituted an unfair or deceptive trade practice which was in commerce and proximately injured the plaintiffs. *See*, N.C. Gen. Stat. §§ 75-1.1, -5(b).

Accordingly, we reverse the order of the trial court granting defendants' motion for summary judgment on plaintiffs' unfair or deceptive trade practice claim.

Affirmed in part, reversed in part.

Judges EAGLES and JOHN concur.